2:30 pm

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

FILED
SEP 26 2007
U.S. COURT OF FEDERAL CLAIMS

MANSON CONSTRUCTION CO.,

Plaintiff,

v.

No. 07-694 C

THE UNITED STATES,

Defendant.

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT**

Plaintiff, Manson Construction Co., ("Manson"), through its undersigned counsel, for its Complaint in the above-captioned matter, alleges as follows:

## NATURE OF ACTION

1. This is a protest of the award of a contract to Great Lakes Dredge & Dock Co., ("GLDD"), after the evaluation of proposals submitted in response to a solicitation issued by the U.S. Army Corps of Engineers, Portland District. The proposals were evaluated under the procedures specified in FAR, Part 15, Contracting by Negotiation.

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1491(b)(1) and (b)(2).

## PARTIES

3. Plaintiff, Manson, an experienced dredging contractor, is a Washington corporation with its principal place of business located in Seattle, WA.

4. Defendant is the United States, acting through its agency, the U.S. Army Corps of Engineers ("Corps"), Portland District.

## FACTUAL ALLEGATIONS

5. On July 24, 2007, the Defendant, acting through the Portland District of the U.S. Army Corps of Engineers, issued a negotiated procurement for the performance of a project entitled "Columbia River Channel Improvement Project (CRCIP) Phase III Dredging." The project included new work dredging for the improvement of the Columbia River from River Mile 67+00 to approximately River Mile 91+00. Disposal of new work material from River Mile 67+00 to River Mile 91+00 was to be located at designated in-water flow lanes and upland sites.

6. "New work" dredging occurs in new channels or navigation projects that are being deepened and widened. The other major type of dredging is "maintenance" dredging which occurs in existing channels to remove material that has been deposited since the channels were previously dredged.

7. Proposals were required to be submitted no later than August 29, 2007.

8. The Plaintiff submitted a proposal in accordance with the terms of the solicitation.

9. The solicitation stated that it was the government's intent to evaluate proposals without discussions and to make an award based on a determination of the proposal that represented the best value to the government.

10. The source selection criteria specified in the solicitation provided that "proposals submitted for this solicitation will be evaluated utilizing the following principal criteria: a) Price b) Technical."

11. The solicitation further provided that "For this solicitation, price is approximately equal in importance to all non-price factors combined."

12. The non-price factors were 1) Technical Project Work Plan, 2) Performance Risk, and 3) Management Plan. Each of these non-price factors was divided into a number of sub-factors. For purposes of evaluation, the RFP provided that "The non-price evaluation factors are equal to each other in importance. All sub-factors within a principal factor are equal in importance to each other."

13. The solicitation stated that the "Technical" factor would "be rated on the offeror's proposed project work plan to determine if it is consistent with the scope of work required by this RFP, and on the suitability and condition of equipment for

dredging and disposal." The following sub-factors were identified for the Technical Project Work Plan factor:

1) Dredging Plant and auxiliary equipment size, type, capacity, condition and certifications to include most recent load and performance test results, recent certification of inspection, and inspector's name, qualifications, and address.

2) Detailed description of production rates necessary to meet dredging requirements for each phase of dredging.

3) All data or assumptions, whether included in the RFP or obtained by other means, used to determine equipment and production rates outlined above.

4) Disposal plan for dredged material including diking and discharge, access, rehandle locations (if applicable), pumpout locations (if applicable) and compliance with environmental requirements. Upland disposal sites to be used and estimated quantity disposed in each (including in-water).

5) Plan for coordination with Columbia River Pilots when using rehandle or pumpout capabilities.

6) Ability to meet environmental requirements including water quality monitoring.

7) Utilization of equipment during the performance period under adverse conditions to include high currents, sand wave shoaling, moderate to large volumes of commercial ship traffic.

8) Quality Control measures for dredging and disposal.

a. Use of multibeam surveys

b. Number of crew, crew strength, work shifts, and crew and staff rotation schedule and overlap.

14. The Performance Risk factor stated that "The proposal will be rated on the probability of successful accomplishment of the work. A good offeror would demonstrate a reasonable degree

of certainty that the offeror would deliver quality work on time." The following subfactors were identified:

1) Schedule;

2) Past Performance;

3) Safety; and,

4) Sub-Contracting Plan.

15. The solicitation stated that the third factor, Management Plan, involved an evaluation of the Project Management plans "for realism and flexibility. Proposals will be evaluated on the qualifications, experience, and accomplishments (in resume format) of the offeror's project team."

16. Under the section "EVALUATION FACTORS FOR AWARD," the solicitation listed the subfactors for evaluation of the Management Plan. The subfactors simply involved a listing of the team members who would be evaluated, as follows:

Project Managers;

Quality Control Managers;

Site Safety Health Officers;

Surveyors;

Water Quality Personnel; and,

Subcontractors directly related to dredging operations.

17. Although the solicitation also required offerors to provide resumes for the "Shore Crew Superintendent" and "Project

Engineers" on the project team, these two positions were not included as evaluation factors for the Management Plan.

18. The RFP did not disclose the rating system that would be used to evaluate these factors and sub-factors.

19. On August 31, 2007, the Contracting Officer sent the Plaintiff an e-mail message requesting additional information regarding the Plaintiff's proposal.

20. The Plaintiff responded to the request in a timely manner, on September 4, 2007, and provided the requested information.

21. There was no further communication from the Defendant until September 10, 2007, when the Contracting Officer issued a letter to the Plaintiff with the subject "Notice of Non-Award and Debriefing of Source Selection for Solicitation No. W9127N-07-R-0022, Columbia River Channel Improvement (CRCIP) Phase III Dredging."

22. The Plaintiff was notified that a contract had been awarded to Great Lakes Dredge & Dock Co. in the amount of $34,320,000, and the letter provided a listing of "Significant Strengths and Weaknesses or Deficiencies in your proposal."

23. The solicitation did not define what constituted a "Significant Strength, Weakness or Deficiency."

24. The September 10, 2007 letter further stated that "This completes the debriefing requirement; however I would be glad to answer any questions you may have."

25. On September 13, 2007, a telephone conference was held between representatives of the parties in which the Plaintiff presented questions about the reasons for its non-selection. The Defendant responded to the questions with the proviso that the responses were not to be considered part of the formal debriefing.

26. The Plaintiff was advised that "Overall, GLDD has submitted a superior proposal, offering an excellent management team and a clear and detailed plan with a proven track record to execute it. GLDD offers the highest degree of certainty of being able to complete this important portion of the Columbia River Channel Improvement Project delivering quality work, on or ahead of schedule and at or under budget while minimizing the probability of unanticipated difficulties, disruption of the work and contract claims. Based on the foregoing, award to GLDD is in the best interest of the government as their offer, taking price and non-price factors into account represents the best value to the Government."

27. The proposed prices were evaluated by considering each offeror's base contract price plus two optional work items. The total evaluated price proposed by the Plaintiff was $47,350,608

and the total evaluated price proposed by the awardee was $49,375,500.

28. Although Plaintiff's price was over $2,000,000 less than the awardee's price, the awardee received an overall technical rating of "Excellent" while the Plaintiff only received an overall technical rating of "Satisfactory."

29. Plaintiff's technical rating of satisfactory was based on the Defendant having rated its Technical Work Plan and Management Plan as Satisfactory. With regard to the third evaluation factor, Performance Risk, the Defendant rated the Plaintiff as Excellent and it was noted that the Plaintiff had received "great performance ratings."

30. Although the Defendant listed various items as "Strengths, Weaknesses or Deficiencies" in the debriefing, it did not identify which items were strengths, weaknesses, or deficiencies, nor did it identify which items pertained to which evaluation factors.

31. Two of the listed "Strengths, Weaknesses or Deficiencies," however, clearly concerned the price proposal, not the technical proposal submitted by Plaintiff.

32. When it debriefed Plaintiff, Defendant indicated that it considered the failure to submit a "Mob/Demob Cost Breakout" with the proposal to be a significant weakness or deficiency.

33. However, when Defendant had earlier requested clarifications, it specifically notified Plaintiff of this oversight, and Plaintiff provided a detailed cost breakdown of its mobilization and demobilization proposed prices. This breakdown was part of the price proposal, not part of the technical proposal, and Defendant had informed Plaintiff that the breakdown "will be used to assist in evaluation of your proposed prices."

34. Since the missing cost breakdown was furnished through clarification, and therefore was part of the proposal, the Defendant's determination that the lack of a "Mob/Demob Cost Breakout" was a significant weakness or deficiency is without a rational basis.

35. In the debriefing, the Defendant also notified the Plaintiff that it considered the "pricing on CLINS [Contract Line Item Numbers] 0003 and 0005 appeared materially unbalanced - far too low." Defendant listed this aspect of Plaintiff's price proposal as a significant weakness or deficiency.

36. CLINS 0003 and 0005 were alternative bid items for limited quantities of material that, if awarded, would have changed the disposal of those quantities from upland to in-water. The Defendant believed that the price for dredging and disposing

of material in-water should be less than the price for dredging and disposing of material upland.

37. Plaintiff's price proposal did contain lower prices for CLINS 0003 and 0005 based on the cost savings it estimated for disposing of the limited quantities of material in-water as opposed to upland.

38. Plaintiff's proposal did not contain nominal prices for some of the line items and enhanced prices for other line items. Plaintiff's price proposal, therefore, was not mathematically unbalanced.

39. If a price proposal is not mathematically unbalanced, it cannot be "materially unbalanced" as Defendant contends.

40. Defendant's contention that Plaintiff's proposal was "materially unbalanced" was arbitrary, capricious, and lacked a rational basis.

41. When Defendant debriefed the Plaintiff, it indicated that although the Technical Work Plan was well written, it "needed more specificity . . . [and] often repeated specs."

42. The solicitation provided that proposals "shall discuss the actual methods proposed as specifically as possible. Responses in the proposal shall reflect an understanding of the

work environment, contract requirements, technical approaches, principles and techniques."

43. Contrary to Defendant's contention that Plaintiff's work plan "needed more specificity," Plaintiff had included the specifics required by the solicitation in its "well written plan."

44. The solicitation had warned offerors that "repeating or restating the specifications without sufficient elaboration will not be appropriate."

45. When Plaintiff prepared its proposal, it was careful not to simply repeat the specifications but to elaborate and discuss the actual methods it proposed to use. Contrary to Defendant's contention that Plaintiff "often repeated specs back to us," Plaintiff did not do so, and only incorporated information from the specifications when it was necessary to do so to reflect an understanding of the contract requirements.

46. With regard to the use of one of the upland disposal sites, the Martin Bar, the Defendant indicated during the debriefing that the lack of developed backup plans in case the quantity of material excavated exceeded the capacity of Martin Bar was a significant weakness or deficiency in Plaintiff's proposal.

47. When the Defendant requested Plaintiff to clarify its proposal, the Defendant noted that Plaintiff's proposal indicated

that Plaintiff intended to dispose of 2,000,000 cubic yards of material at the Martin Bar upland disposal site when Defendant believed that the maximum capacity of the Martin Bar was only 1,000,000 cubic yards. Defendant requested the Plaintiff to provide clarification.

48. In the clarification that Plaintiff submitted to Defendant, Plaintiff informed Defendant that it only planned to place a total of 1,124,425 cubic yards in the Martin Bar upland disposal site, not 2,000,000 cubic yards, which was approximately the capacity of the site to elevation +51 feet. Plaintiff, in its clarification, clearly indicated that it would use one of the Northport upland disposal sites, which was the backup plan that Plaintiff included in its initial proposal, and, if necessary, develop additional upland disposal sites should it need additional capacity.

49. Contrary to Defendant's assertion, Plaintiff furnished sufficient detail in its proposal of its contingency plan in case the material excavated exceeded the quantity that could be contained in the Martin Bar upland disposal site.

50. Accordingly, the Contracting Officer lacked a rational basis for giving the Plaintiff's Technical Work Plan the downgraded rating of "Satisfactory."

51. When Defendant debriefed Plaintiff, it indicated that Plaintiff's Management Plan was significantly weak or deficient

because it's proposed "management staff was too thin," because Plaintiff "proposed 6 people to manage the entire job for the entire duration."

52. The solicitation did not require offerors to propose a particular size for the management staff, and the size of the management staff was not an evaluation criteria in the solicitation.

53. Contrary to Defendant's contention, Plaintiff submitted a management staff of eight people, not six.

54. The only requirements in the specifications for particular management staff was that offerors were to have on staff a certain number of Site Safety and Health Officers and Contractor Quality Control staff. Plaintiff's proposed management staff included the number of SSHO/CQC personnel that were required by the specifications.

55. The Defendant did not have a rational basis to conclude that Plaintiff's "management staff was too thin." Contrary to the Defendant's contention the size of management staff that Plaintiff proposed had successfully managed projects of a similar magnitude and complexity, and was sufficient to meet the realism and flexibility criteria in the solicitation.

56. The Defendant also identified as a significant weakness or deficiency that Plaintiff's proposal "lacked any discussion of Shore Superintendent."

57. Although the solicitation listed the position of "Shore Crew Superintendent" as one of the project team members in the Management Plan, the solicitation did not include the "Shore Crew Superintendent" as one of the evaluation factors for award.

58. In addition, the specifications did not require the contractor to provide a shore crew superintendent in the performance of the work; the specifications only required the contractor to superintend the overall project.

59. Since the specifications did not identify any required qualifications for the "Shore Crew Superintendent," and the solicitation did not include the "Shore Crew Superintendent" in the "Evaluation Criteria For Award," omitting an identification of the "Shore Crew Superintendent" was not a material failure to meet a solicitation requirement. Plaintiff's omission of the identity of the "Shore Crew Superintendent" was not a flaw that would appreciably increase the risk of unsuccessful contract performance.

60. During the debriefing, the Defendant also stated that the lack of discussion of "Surveyors" was a significant weakness or deficiency.

61. The specifications contained no specific requirements concerning the surveyors that Plaintiff would employ on the project.

62. With regard to the qualifications and experience of Plaintiff's staff, the specifications simply required that the Contractor Quality Control managers were to have the qualifications of a Field Engineer, including hydrographic survey experience.

63. The management staff proposed by the Plaintiff in its proposal clearly identified the candidates for the quality control positions as Field Engineers with hydrographic experience.

64. In the section of its proposal regarding "Dredging Plant and Auxiliary Equipment," Plaintiff also identified the hydrographic survey equipment and software that it would use on the project, all of which met the specification requirements.

65. Contrary to Defendant's contentions, Plaintiff's management plan provided sufficient information to insure that the proper level of effort would be directed toward each aspect of the work, and to insure that the Plaintiff had the required organization and personnel.

66. The Contracting Officer lacked a rational basis for determining that the Plaintiff's Management Plan should be given the downgraded rating of "Satisfactory."

67. Since the Contracting Officer lacked a rational basis for rating both Plaintiff's Technical Work Plan and Management Plan as "Satisfactory," the Contracting Officer lacked a rational

basis to rank Plaintiff as merely "Satisfactory" for the Technical Evaluation Factor.

68. The proposal submitted by Plaintiff warranted an overall Technical rating of Excellent.

69. Given the fact that the Plaintiff's price proposal was approximately two million dollars lower than the awardee's price proposal, the Defendant's selection of GLDD's proposal as the best value was arbitrary, capricious, and lacking a rational basis.

**REQUEST FOR RELIEF**

WHEREFORE, MANSON CONSTRUCTION CO. respectfully requests that this Court enter an Order providing for:

1. A temporary restraining order preventing the United States from allowing GLDD to proceed with the performance of the project.

2. A declaratory judgment that the source selection was flawed because it was based on an evaluation and rating of Plaintiff's proposal that was not in accordance with the advertised source selection criteria in the solicitation.

3. A preliminary and permanent injunction directing the Contracting Officer to rescind the award to GLDD and to re-evaluate the proposals in a fair and proper manner giving the Plaintiff due credit for its compliance with the requirements of the solicitation.

4. A preliminary and permanent injunction further directing the Contracting Officer to give appropriate weight to the Plaintiff's lower price.

5. Such other relief as the Court deems just and proper under the circumstances of this case.

Respectfully submitted,

Date: September 26, 2007

for Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777/215-542-2779(fax)

Attorney of Record for
MANSON CONSTRUCTION CO.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| MANSON CONSTRUCTION CO., | : | |
| Plaintiff, | : | |
| v. | : | No. |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**CERTIFICATE REQUIRED BY RULE 65 OF THE RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS**

I, Michael H. Payne, the undersigned counsel of record for MANSON CONSTRUCTION CO., certify that I hand-delivered or caused to be hand-delivered, two copies of the Complaint, Application for Temporary Restraining Order, Motion for Preliminary Injunction, and accompanying documents to Commercial Litigation Branch, Civil Division, U.S. Department of Justice, 1100 L Street, N.W., Room 12124, Washington, D.C. 20530, in accordance with Rule 65(f)(1) of the Rules of the United States Court of Federal Claims.

Respectfully submitted,

Dated: September 26, 2007

for [signature]
Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779 (fax)
mhp@phslegal.com
Attorney of Record for
MANSON CONSTRUCTION CO.