10/19/07
Agreed-Upon Redacted Copy
May Be Made Public

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MANSON CONSTRUCTION CO.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>v.<br><br>GREAT LAKES DREDGE & DOCK CO. LLC<br><br>Intervenor-Defendant. | **Electronically Filed On October 5, 2007**<br><br>**NO.: 07-694C**<br>**(Judge Christine Miller)** |

# INTERVENOR GREAT LAKES DREDGE & DOCK COMPANY LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**Daniel C. Sauls**
**Steptoe & Johnson LLP**
**1330 Connecticut Avenue, N.W.**
**Washington, D.C. 20036**

**Attorney of Record for Intervenor Great Lakes Dredge & Dock Company LLC**

**Of Counsel:**
**Thomas P. Barletta**
**Steptoe & Johnson LLP**
**1330 Connecticut Avenue, N.W.**
**Washington, D.C. 20036**

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

## TABLE OF CONTENTS


Page

I. STATEMENT OF ISSUES ..... 1

II. STATEMENT OF FACTS/STATEMENT OF THE CASE ..... 1

III. ARGUMENT ..... 5

A. Standard Of Review ..... 5

B. Manson's Contention That It Was Improperly Evaluated On Two Matters On Which It Provided Information In Response To Clarification Questions Must Be Rejected ..... 7

1. Mob/Demob Cost Breakdown ..... 8

2. Martin Bar Disposal Area ..... 10

C. Manson's Contentions Regarding Unbalanced Pricing Provide No Basis for Relief ..... 13

D. Manson's Other Complaints Regarding The Evaluation Of Its Technical Work Plan And Management Plan Proposals Are Meritless, And The Corps Properly Rated Manson As [redacted] Under These Two Evaluation Factors ..... 18

1. The Corps Correctly Noted That Manson's Technical Work Plan Lacked Specificity and Repeated The Specifications ..... 18

2. The Corps Properly Considered The Size Of The Management Team Proposed By Manson ..... 21

3. The Corps Properly Relied Upon Manson's Failure To Address The Shore Crew Superintendent Position As Required By The RFP ..... 24

4. The Corps Properly Recognized Manson's Failure To Adequately Address Surveyors As Part Of Its Management Team ..... 27

5. Manson's Over-Reliance On Its [redacted] Rating On The Performance Risk Subfactor Is Misplaced ..... 29

6. Manson Has Completely Failed To Establish That It Should Have Received An Exceptional Rating On Either The Technical Work Plan Or Management Plan Factors ..... 30

E. The Corps' Cost/Technical Trade Off And Best Value Determination Were Reasonable And Supported By The Record ..... 32

IV. CONCLUSION ..... 36

APPENDIX


PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**FEDERAL CASES** **Page(s)**

Al Ghanim Combine Group Co. v. United States,
56 Fed. Cl. 502 (2003) .......... 15, 16

Alfa Laval Separation, Inc. v United States,
175 F.3d 1365 (Fed. Cir. 1999) .......... 7

Allied Tech. Group, Inc. v. United States,
39 Fed. Cl. 125 (1997) .......... 26

Arca, Inc. v. United States,
44 Fed. Cl. 288 (1999) .......... 6

Avfel Servs. Inc. v. United States,
70 Fed. Cl. 173 (2005) .......... 31

Banknote Corp. of America v. United States,
56 Fed. Cl. 377 (2003) .......... 22

Bean Stuyvesant LLC v. United States,
48 Fed Cl. 303 (2000) .......... 6, 7, 12, 18, 21, 23, 26

CACI, Inc.-Federal v. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 6

CCL Serv., Corp. v. United States,
48 Fed. Cl. 113 (2000) .......... 6, 7, 16, 31

Cubic Defense Sys. Inc. v. United States,
45 Fed. Cl. 450 (1999) .......... 30, 31

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir. 1996) .......... 7, 32

Erinys Iraq Ltd. v. United States,
__ Fed. Cl. __ , slip op. (Sept. 14, 2007) .......... 6, 7

Forestry Surveys and Data v. United States,
44 Fed. Cl. 493 (1999) .......... 33

Fort Carson Support Servs. v. United States,
71 Fed. Cl. 571 (2006) .......... 30

Fru-Con Constr. Co. v. United States,
57 Fed. Cl. 483 (2003) ............................................................6, 7, 21

Hydro Eng., Inc. v. United States,
37 Fed. Cl. 448 (1997) ............................................................32

JWK Int'l Corp. v. United States,
49 Fed. Cl. 371 (2001), aff'd, 279 F.3d 985 (Fed. Cir. 2002) ............................................................6

Overstreet Elec. Co. v. United States,
59 Fed. Cl. 99 (2003) ............................................................32, 33

SDS Int'l v. United States,
48 Fed. Cl. 759 (2001) ............................................................32, 33

Stratos Mobile Networks USA, LLC v. United States,
213 F.3d 1375 (Fed. Cir. 2000)............................................................5

Synetics, Inc. v. United States,
45 Fed. Cl. 1 (1999) ............................................................6, 30

**COMPTROLLER GENERAL CASES**

Anthony Hernandez, B-246104, 92-1 C.P.D. ¶ 146 (Feb. 4, 1992)..................................26

CAS, Inc., B-260934 et al., 95-2 C.P.D. ¶ 239 (Sept. 12, 1995)..................................31

DSDJ, Inc., B-288438 et al., 2002 C.P.D. ¶ 50 (Oct. 24, 2001)..................................23

EER Systems, Inc., B-290971.3 et al., 2002 C.P.D. ¶ 186 (Oct. 23, 2002)..................................31

J.A. Jones Mgmt. Serv., B-254941 et al., 94-1 C.P.D. ¶ 244 (March 16, 1994)..................................30

Johnson Controls, Inc., B-282326, 99-2 C.P.D. ¶ 6 (June 28, 1999)..................................18

KBM Group, Inc., B-281919 et al., 99-1 C.P.D. ¶ 118 (May 3, 1999)..................................31

KPMG Consulting LLP, B-290716, 2002 C.P.D. ¶ 196 (Sept. 23, 2003)..................................33

Maytag Aircraft Corp., B-278589, 2001 C.P.D. ¶ 121 (July 5, 2001)..................................18

NCLN 20, Inc., B-287692, 2001 C.P.D. ¶ 136 (July 25, 2001)..................................23

Science & Tech., Inc., B-272748 et al., 97-1 C.P.D. ¶ 121 (Oct. 25, 1996)..................................26

United Ammunition Container, Inc., B-275213, 97-1 C.P.D. ¶ 58 (Jan. 30, 1997 .................. 30

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(A) .................................................. 6

**REGULATIONS**

FAR 15.101-1 .................................................. 32
FAR 15.204-1 .................................................. 26
FAR 15.404-1(b) .................................................. 17
FAR 15.404-1(g) .................................................. 13, 15, 16, 17
FAR 15.814 (1997) .................................................. 16

## I. STATEMENT OF ISSUES

1. Whether The Corps Properly Considered Manson's Responses To Two Clarification Questions

2. Whether The Corps Properly Evaluated Manson's Pricing On Contract Line Items 0003 And 0005

3. Whether The Corps' Evaluation Of The Remainder Of Manson's Technical Work Plan And Management Plan Was Rational And Consistent With The Terms Of The Solicitation

4. Whether The Corps' Cost/Technical Trade Off And Best Value Determination Were Rational

## II. STATEMENT OF FACTS/STATEMENT OF THE CASE

The Corps issued Request for Proposal No. W9127N-07-R-0022 ("RFP") on July 24, 2007. Administrative Record ("AR") Tab 5 at 40. The RFP called for the contractor to perform up to 7.4 million cubic yards of dredging to deepen an approximately 24-mile long section of the Columbia River in the states of Washington and Oregon. Id. at 45. It provided for placement of the dredged material at both in-water and upland disposal sites, with the majority of the material to be pumped to a number of upland disposal sites. Id.

Section 00100 of the RFP provided the source selection criteria, instructions to offerors and evaluation factors for award. It plainly provided that this was a best value procurement where award could be made to an offeror other than the lowest priced offeror:

> The contract will be awarded to the firm submitting the proposal considered to be the best in terms of the technical evaluation factors and price that is determined to be in the best interest of the government and therefore, the project will not be necessarily awarded to the firm submitting the lowest priced proposal.

AR Tab 5 at 49.

There were four evaluation factors: Technical (or Technical Work Plan), Performance Risk, Management Plan and Price. Price was approximately equal in importance to all non price

factors combined, and the non price factors were equal to each other in importance. All sub-factors within a factor also were equal in importance to each other. Id. at 49, 52.

The RFP provided that under the Technical Work Plan factor, an offeror would be rated on its "proposed project work plan to determine if it is consistent with the scope of work." Id. at 49. It further provided that the Government would also evaluate "how effectively ***and completely***" the offeror's plan discussed several elements of the work plan, including equipment, production rates, disposal plan, and quality control measures. Id. at 49-50, 53 (emphasis supplied). Offerors were required to furnish a plan that would "insure the proper level of effort is directed toward each aspect of the services required." Id. at 52.

The Performance Risk factor considered "the probability of successful accomplishment of the work" under four subfactors; schedule, past performance, safety and subcontracting plan. Id. at 50-51. For the Management Plan factor, the RFP provided that Project Management Plans would be evaluated "for realism and flexibility" and that:

> Proposals will be evaluated on the qualifications, experience, and accomplishments (in resume format) of the offeror's project term. The following project team members ***shall be included***:
>
> 1. Project Manager(s)
> 2. Quality Control Manager(s)
> 3. Site Safety Health Officer(s)
> 4. ***Shore Crew Superintendent***
> 5. Project Engineer(s)
> 6. ***Surveyors***
> 7. Water Quality Personnel
> 8. Subcontractors directly related to dredging operations

Id. at 51 (emphasis supplied). The RFP also required submission of a Management Plan proposal that would "insure that the Contractor has at his/her disposal the organization and personnel required by the scope of work of the contract." Id. at 52.

Under the Price factor, the RFP provided that the price would be evaluated "to determine if it is fair and reasonable." Id. at 53. The RFP also required submission of a detailed breakdown of the offeror's mobilization and demobilization cost, and provided that the Government would perform a price analysis by comparing the proposed prices to those of other offerors and the Government estimate. Id.

The RFP also advised offerors that their proposals "MUST INCLUDE SUFFICIENT DETAILED DATA AND PLANS TO BE EVALUATED UNDER THESE CRITERIA. OMITTED AND AMBIGUOUS DATA WILL RESULT IN PROPOSALS RECEIVING LOWER SCORES." Id. at 52 (emphasis in original). Offerors were warned that "[r]epeating or restating the specifications without sufficient elaboration will not be acceptable" and that they should "discuss the actual methods proposed as specifically as possible." Id.

Two offerors, intervenor Great Lakes Dredge & Dock Co. LLC ("GLDD") and plaintiff Manson Construction Co. ("Manson") submitted offers. The offerors' proposals under the Technical Work Plan, Performance Risk and Management Plan factors were evaluated by the Corps' Technical Evaluation Team ("TET"). AR Tab 31 at 1026. The TET members assigned ratings of Excellent, Satisfactory or Unsatisfactory to various elements of the offerors' proposals identified in the RFP. AR Tabs 21-24.

The TET members also identified strengths and weaknesses in the proposals. For GLDD, for example, the TET concluded that [redacted]

[redacted] AR Tab 31 at 1026.

[redacted]

| | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

The offerors' price proposals were evaluated by the Price Evaluation Team ("PET"). Id. The PET concluded that the prices submitted by both offerors were fair and reasonable and could

be considered for award. Id. at 1028. GLDD's price was [redacted] and Manson's price was [redacted] Id.

The Contracting Officer ("CO") served as the Source Selection Authority ("SSA") for this procurement. AR Tab 6 at 542. The SSA carefully reviewed the results of the TET and PET evaluations and agreed with these results. The SSA determined that there was a "meaningful and substantive difference" between the offerors' technical (non price) proposals that "warrants consideration of awarding on other than the lowest-priced offer." AR Tab 31 at 1028. Because GLDD received higher ratings on the non-cost evaluation factors and Manson proposed a lower price, the SSA performed a cost/technical tradeoff, which is described in detail in the Source Selection Decision Document ("SSDD"). Id. at 1028-1029.

As described more fully in the SSDD and in Section III.E infra, the SSA recognized Manson's approximately [redacted] price advantage, but concluded that GLDD's advantages under the non price evaluation factors made GLDD's offer the best value offer to the government, taking price and non price factors into account. Id. at 1029. The Corps awarded a contract under the RFP to GLDD on September 10, 2007. AR Tab 34. Manson filed this action on September 26, 2007.

## III. ARGUMENT

### A. Standard Of Review

This Court and the Court of Appeals for the Federal Circuit repeatedly have recognized that review of agency procurement award decisions is limited. "[T]he decision of an agency to award a contract must be upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Stratos Mobile Networks USA, LLC v.

United States, 213 F.3d 1375, 1379-80 (Fed. Cir. 2000) (quoting the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)); accord Fru-Con Constr. Co. v. United States, 57 Fed. Cl. 483, 485 (2003). Under this standard, the Court is not empowered to substitute its judgment for that of the agency. JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir. 2002); CCL Serv., Corp. v. United States, 48 Fed. Cl. 113, 120 (2000). This is true even if reasonable minds could reach different conclusions. Bean Stuyvesant LLC v. United States, 48 Fed Cl. 303, 320 (2000).

Moreover, "[a] court may not interfere with an agency's procurement decision unless 'it is clear that the agency's determinations were irrational and unreasonable.'" Fru-Con Constr., 57 Fed. Cl. At 485 (quoting Arca, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999)). Accordingly, courts will interfere with the procurement process "only in extremely limited circumstances." CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quotations and citations omitted); CCL Serv., 48 Fed. Cl. at 120. Therefore, the plaintiff in a bid protest case bears a "'heavy burden' of proving a lack of rational basis or a violation of the law by a preponderance of the evidence." Erinys Iraq Ltd. v. United States, __ Fed. Cl. __ , slip op. at 12 (Sept. 14, 2007).

It is also well-established that courts "afford agencies wide discretion" in the evaluation of proposals. Id. at 12; CCL Serv., 48 Fed. Cl. at 120. See Synetics, Inc. v. United States, 45 Fed. Cl. 1, 5 (1999) ("agencies are entrusted with a good deal of discretion in determining which bid is the most advantageous to the government") (quotation omitted). "This deference is particularly great when a negotiated procurement is involved and is greater still when the

procurement is a 'best value' procurement." Bean Stuyvesant, 48 Fed. Cl. at 320; see Erinys Iraq, slip op. at 12.

In addition, in situations such as here, "where the court must review technical matters that are within the agency's expertise, the highest degree of deference is warranted." Bean Stuyvesant, 48 Fed. Cl. at 310 (citation omitted). See CCL Serv., 48 Fed. Cl. at 120 ("technical rating decisions are the 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess.'") ( quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). Moreover, "[t]he fact that [a protester] disagrees with the evaluator's conclusions is not enough for this court to overturn them." Fru-Con Constr., 57 Fed. Cl. at 485; Bean Stuyvesant, 48 Fed. Cl. at 329 ("mere disagreement" with the agency's evaluation is not sufficient to establish that the evaluation was arbitrary and capricious).

Finally, not all violations of the APA standard entitle a disappointed bidder to relief. The bidder also must show that it was actually prejudiced by agency conduct and must demonstrate that, but for the agency's error, it would have a substantial chance of receiving award. See Alfa Laval Separation, Inc. v United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Erinys Iraq, slip op. at 11.

### B. Manson's Contention That It Was Improperly Evaluated On Two Matters On Which It Provided Information In Response To Clarification Questions Must Be Rejected

Manson contends that the Corps improperly found significant weaknesses in its proposal in two areas – [redacted] – in which

Manson submitted information in response to a request for clarification from the Corps. See Complaint ¶¶ 32-34, 46-49. As shown below, the Corps' evaluation of Manson's proposal in these two areas was completely proper, and the Court must therefore reject this protest ground.

The RFP specifically instructed offerors that "PROPOSALS SUBMITTED IN RESPONSE TO THIS SOLICITATION MUST INCLUDE SUFFICENT DETAILED DATA AND PLANS TO BE EVALUATED UNDER THESE [PRICE AND TECHNICAL] CRITERIA. OMITTED AND AMBIGUOUS DATA WILL RESULT IN PROPOSALS RECEIVING LOWER SCORES." AR Tab 5 at 52 (emphasis in original). It also emphasized that "[i]t is the offeror's responsibility to insure that his/her proposal is complete prior to submittal," and that the Corps "may evaluate solely on the information provided in the proposal and will not assume that an offeror possesses any capability unless specified in the proposal." Id. at 51.

### 1. Mob/Demob Cost Breakdown

With respect to the Price proposals, the RFP further directed that "[a]ll proposals shall be complete [and] detailed" and that price proposals would be reviewed for, among other things, "completeness." Id. at 53. In addition, the RFP specifically stated that "[a] detailed breakdown of the offeror's mobilization and demobilization cost shall be submitted" as part of the price proposal. Id.

It is undisputed that Manson failed to provide any breakdown of its mob/demob costs when it submitted its proposal. AR Tab 15 at 680-704. Therefore, the Corps properly identified this failure to supply information required by the RFP during its evaluation. AR Tab 38 at 1541 (debriefing letter).

The Corps then asked Manson to provide a breakdown of its mob/demob costs in a clarification question dated August 31, 2007. See AR Tab 30 at 1017-18. In doing so, the Corps advised Manson that the information would be used to assist in the evaluation of its proposed prices. Id. Manson submitted mob/demob information without further inquiry or objection on September 4. AR Tab 30 at 1023. The Corps reviewed the breakdown and, as demonstrated by the evaluation record, this issue had no further effect on the evaluation of Manson's proposal.

Indeed, Manson's complaint that it received a [redacted] for failure to submit the mob/demob breakdown with its proposal even though it later provided a breakdown with its September 4 letter (Complaint ¶¶ 32-34, Memo[1] at 17) ignores the fact that the Corps' identification of this issue had no impact on either the price evaluation or the source selection decision. The record establishes that the Corps accepted Manson's proposed price, including its proposed mob/demob price, as submitted in its proposal. AR Tab 31 at 1028. The Corps also found Manson's price, including the mob/demob price, to be fair and reasonable, and the Corps relied on Manson's submitted prices in its source selection decision. Id. at 1027-29.

In short, the evaluation of Manson's proposed pricing was completely unaffected by Manson's initial failure to provide the required cost breakdown.[2] Likewise, Manson's failure to submit the breakdown of its mob/demob costs with its proposal was not a factor in the Corps' decision to select GLDD for award. Indeed, it is not even mentioned in the SSDD. The fact that the Corps, in the post-award debriefing letter sent to Manson (AR Tab 38 at 1541), informed

[1] References to "Memo" in this brief refer to the Memorandum of Points and Authorities in Support of Manson's Motion for Temporary Injunction, Permanent Injunction and Declaratory judgment, filed by Manson on September 26, 2007.

[2] As Manson concedes, Complaint ¶ 31, its failure to provide the required cost breakdown also did not impact its technical evaluation.

Manson of its failure to include the breakdown when it submitted its proposal does not change the fact that this failure had no effect on the final price evaluation or the source selection decision.

**2. <u>Martin Bar Disposal Area</u>**

Manson's complaint regarding its planned use of the Martin Bar disposal area is equally without merit. As noted above, the RFP directed offerors to submit a complete proposal that provided sufficient information to permit evaluation and warned them that inadequate or ambiguous proposals could be downgraded. In addition, the instructions related to the Technical proposal specifically directed that those proposals "shall contain methods of approach to the services required and other information considered pertinent to meeting the requirements," AR Tab 5 at 52, and specifically advised offeror's that their technical proposals would be evaluated on "how effectively and completely the [work] plan discusses," inter alia, the "[d]isposal plan for dredged material [including] . . . [u]pland disposal sites to be used and estimated quantity disposed in each." Id. at 49.

Manson's proposal stated that it intended to use the Martin Bar upland disposal site as its principal disposal area and proposed to dispose of [redacted] cubic yards of material dredged between River Miles ("RM") 82 and 85 at that site. See AR Tab 14 at 639. [redacted] The Corps was concerned about this aspect of Manson's proposal in the technical evaluation, as the Corps estimated the capacity of the Martin Bar site to be no more than [redacted] cubic yards. AR Tab 31 at 1027.

The Corps asked Manson to clarify this matter, pointing out that while Manson planned to dispose of about [redacted] at Martin Bar, the Corps estimated its maximum capacity at 1 million cubic yards. See AR Tab 30 at 1018. Manson responded that it expected to dredge about [redacted] and that it estimated the capacity of the Martin Bar site at [redacted]. The letter went on to provide a one sentence "mitigation plan" regarding what Manson would do if it was wrong about the capacity at this site, stating that "[i]f or when the disposal site is filled, we will dike additional sites or haul it to the Northport site." AR Tab 30 at 1021.

The Corps considered Manson's response to be "satisfactory" but insufficient to change Manson's rating, because the Corps continued to have concerns about the [redacted] and the potential adverse effects of having to find and use alternative disposal sites if Manson's estimate proved incorrect. See AR Tab 31 at 1028-29. In particular, the Corps concluded that

[redacted]

Id. at 1029.

As demonstrated, above, Manson's contentions (Memo at 14-15) that the Corps ignored its response to the clarification request and that Manson's response adequately addressed the

Corps' legitimate concerns over Manson's proposed use of the Martin Bar disposal site are meritless. The record establishes that the Corps fully considered Manson's response, but reasonably had continuing concerns about the [redacted] See AR Tab 31 at 1028-29. Therefore, the Corps had a "rational basis" for continuing to question Manson's approach in this regard. Manson's contentions are nothing more than a mere disagreement with the Corps' evaluative judgment and do not state a valid basis for protest. See, e.g., Bean Stuyvesant, 48 Fed. Cl. at 329.

The Court also should note that contrary to Manson's assertions (Memo at 4, 15), the [redacted] was not the only issue that the Corps had with Manson's Technical Work Plan. For example, as demonstrated in Section III.D.1 below and in the Appendix to this brief at 3-4, large portions of [redacted] In addition, [redacted] Manson's proposal did not specifically identify the [redacted] The Corps also was concerned about the failure to address this subject. AR Tab 22 at 979. Manson's [redacted] egarding other aspects of its Technical Work Plan is addressed in Section III.D.1 below.

PROTECTED INFORMATION TO BE DISCL[redacted]NLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDE[redacted]CLAIMS PROTECTIVE ORDER

## C. Manson's Contentions Regarding Unbalanced Pricing Provide No Basis for Relief

Manson also challenges the Corps' conclusion that its proposal appeared to be materially unbalanced in CLINS 0003 and 00005, contending that this conclusion was arbitrary, capricious and lacked a rational basis. Complaint ¶ 40; Memo at 17-19. This contention is without merit and provides no basis for questioning the award to GLDD. The record demonstrates that the Corps followed the requirements of FAR 15.404-1(g) regarding analysis of Manson's proposal for unbalanced pricing. In addition, although the Corps correctly found that Manson's prices for these two CLINS appeared to be unbalanced based on price analysis, the Corps did not find that this unbalancing posed an unacceptable risk to the Government and therefore considered all of Manson's proposed prices for award.

The RFP provided for both upland and in-water disposal of dredged material. For example, in the base work, it provided under CLIN 0002AB that 1.2 million cubic yards of the total estimated quantity of 5.2 million cubic yards of dredged material could be disposed of in-water, with the remaining and 4.0 million cubic yards to be disposed of at an upland disposal site. See AR Tab 5 at 45. The RFP also provided for additional in-water placement sites for use by the contractor. AR Tab 5 at 308. Pricing for these in-water relief sites was governed by CLINS 0003 (base work) and 0005 (option work), which provided for an estimated 400,000 cubic yards and 150,000 cubic yards respectively, of the total estimated quantities to be disposed of in-water. Id. at 45. Since in-water disposal is less expensive than upland disposal, the Corps expected the offerors to provide the Government with a credit for in-water disposal in CLINS 0003 and 0005. See id.; AR Tab 31 at 1027.

**PROTECTED INFORMATION TO BE DISCLO[redacted]LY IN ACCORDANCE WITH UNITED STATES COURT OF FEDER[redacted]AIMS PROTECTIVE ORDER**

The RFP also included several provisions relating to the evaluation of the offerors' prices. The Evaluation Factors for Award section of the RFP stated that prices would be evaluated to determine if they were "fair and reasonable." AR Tab 5 at 53. In addition, Note 6 to the Bid Schedule provided that a bid "may be rejected" if the CO determined that "the price for any line item or sub-line item is materially unbalanced." Id. at 46-47, and went on to state that "[a] bid is materially unbalanced if it is mathematically unbalanced," and if there was a "reasonable doubt that [it] would result in the lowest overall cost to the Government" or "is so grossly unbalanced that its acceptance would be tantamount to allowing an advanced payment." Id.

As Table 1 indicates, Manson [redacted] This proposed [redacted] than the credit contained in the Government's estimate and in GLDD's proposal.

Table 1: In-Water Disposal Credits[3]

| | Original Government Estimate | GLDD | Manson |
|---|---|---|---|
| CLIN 0003 In-water Disposal Credit/cy | [redacted] | [redacted] | [redacted] |
| CLIN 0005 In-water Disposal Credit/cy | [redacted] | [redacted] | [redacted] |

[3] Sources: Original Government Estimate: AR Tab 13 at 579; GLDD: AR Tab 18 at 920; Manson: AR Tab 15 at 687. As demonstrated by the record, the original Government estimate did not include [redacted] Therefore, the revised Government estimate included [redacted] an even wider gap between [redacted] and the Government estimate. AR Tab 28 at 1008-1010.

The Corps compared Manson's proposed in-water disposal credit with the Government estimate and GLDD's proposed credit. [redacted] AR Tab 31 at 1027-28; see also AR Tab 38 at 1541.[4] Manson contends that the Corps erred in finding that its proposal was materially unbalanced because the Corps did not first find that it was mathematically unbalanced. That contention is fundamentally flawed and must be rejected.

While the RFP stated that the Corps could ***reject*** a bid that was materially unbalanced because it was mathematically unbalanced, it did not preclude the Corps from considering whether a bid was unbalanced as part of its broader evaluation of Manson's proposed pricing. Indeed, the very unbalancing analysis performed by the Corps here is required by FAR 15.404-1(g)(2), which states that "[a]ll offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced." See Al Ghanim Combine Group Co. v. United States, 56 Fed. Cl. 502, 513 (2003). Further, FAR 15.404-1(g) did ***not*** require the Corps to first find that Manson's bid was mathematically unbalanced in order to conclude that it was unbalanced.

FAR 15.404-1(g) provides in relevant part that "[u]nbalanced pricing may increase performance risk and could result in payment of unreasonably high prices." It further states that

---

[4] Manson incorrectly suggests that CLINS 0003 and 0005 were "alternate bid items" that would only apply "if awarded." Complaint at ¶ 36. The RFP made clear that this was not the case and that the estimated in-water disposal amounts were part of the contract quantities. See, e.g., AR Tab 5 at 46 (stating "[t]he quantity stated in Line Item 0002 includes the quantity stated in Line Item No. 0003"). Further, the price at which the contract was awarded to GLDD reflected application of the in-water disposal credit in CLIN 0003. See AR Tab 36 at 1047 (lines 22 & 23).

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

"[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques." There is no mention of mathematical unbalancing and no requirement that the agency find that some prices are nominal and other prices are enhanced as alleged by Manson. (Complaint at ¶¶ 38-39; Memo at 18).[5]

Thus, under the current version of the FAR, unbalanced pricing may exist if a single price is significantly over or under stated. FAR 15.404-1(g)(1); Al Ghanim, 56 Fed. Cl. at 515, n.17 . The regulation then provides that if the application of cost or price analysis techniques indicate that an offer is unbalanced, the agency should "[c]onsider the risks to the Government associated with the unbalanced pricing . . . in making the source selection decision," and to "[c]onsider whether award of the contract will result in paying unreasonably high prices for contract performance." Finally, the current regulation permits the CO to reject an offer if the CO concludes that "the lack of balance poses an unacceptable risk to the Government." FAR 15.404-1(g)(2), (3).

Manson concedes (Memo at 18) that FAR 15.404-1(g) "provides that cost or price analysis techniques are to be used to determine if offers are unbalanced," and that is precisely what the Corps did here. It relied on two well established price analysis techniques, comparison

---

[5] The FAR provisions regarding unbalanced offers were substantially revised in 1997. Those revisions eliminated any requirement that an analysis of unbalancing must first find that an offer is "mathematically unbalanced" or that an offer must contain both significantly understated and overstated prices to be considered unbalanced. Compare FAR 15.404-1(g) with FAR 15.814 (January 1997) (copies attached as Appendix pages 1-2). All of the cases on which Manson relies regarding mathematical unbalancing ( Memo at 18) were decided before the 1997 FAR revision and are inapplicable under the current regulation. See CCL Serv. 48 Fed. Cl. at 121-22 (quoting GAO advisory opinion recognizing that the FAR provisions relating to unbalanced pricing were modified effective January 1, 1998).

**PROTECTED INFORMATION TO BE DIS[redacted]ED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FE[redacted]L CLAIMS PROTECTIVE ORDER**

of Manson's proposed in-water disposal credit with the Government estimate and comparison with GLDD's proposed credit, in concluding that Manson's proposed CLIN 0003 and 0005 prices appeared to be materially unbalanced; i.e., that Manson appeared to substantially understated the credit (savings) that should have accrued to the Government from using relief in-water disposal.[6] See AR Tab 31 at 1027 (stating that "[t]he size of the discrepancy between Manson's offer, the IGE and GLDD's offer makes Manson's offer unbalanced"). As Table 1 indicates, the Corps' conclusion that Manson's proposed pricing for CLINS 0003 and 0005 was unbalanced was clearly reasonable.

Although the Corps identified the unbalancing in Manson's CLIN 0003 and 0005 prices, it did not reject Manson's proposal or conclude that these prices would result in the Corps paying unreasonably high prices for contract performance. Instead, the Corps concluded that Manson's proposed price was fair and reasonable, accepted Manson's proposed price of [redacted] and used that price in the cost/technical trade off in the source selection decision. AR Tab 31 at 1027-29. See CCL Serv., 48 Fed. Cl. at 122 (recognizing that FAR 15.404-1(g) permits, but does not require, an agency to reject an unbalanced proposal). The SSDD did note that if circumstances permitted greater in-water disposal, GLDD's proposal, with its significantly larger credit, would become "increasingly more reasonable and appropriate in comparison with Manson's." Id. at 1027. However, this statement is undeniably accurate, and in any event, Manson's unbalanced pricing was not even mentioned in the "Tradeoff Analysis" section of the SSDD. Id. at 1028-29.

---

[6] See FAR 15.404-1(b)(3), which states that "[c]omparison of proposed prices received in response to the solicitation," is a "preferred technique" for price analysis and that "comparison of proposed prices with independent Government cost estimates" is another accepted price analysis technique.

**PROTECTED INFORMATION TO BE DISC[redacted]ED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FE[redacted]AL CLAIMS PROTECTIVE ORDER**

**D. Manson's Other Complaints Regarding The Evaluation Of Its Technical Work Plan And Management Plan Proposals Are Meritless, And The Corps Properly Rated Manson As [redacted] Under These Two Evaluation Factors**

In the remainder of its protest, Manson asserts that its ratings of [redacted] under the Technical Work Plan and Management Plan factors lacked a rational basis because the Corps improperly identified a number of other problems in its proposal. As shown below, the record fully supports the Corps' evaluation and the assignment of these [redacted] ratings.

**1. The Corps Correctly Noted That Manson's Technical Work Plan Lacked Specificity and Repeated The Specifications**

Manson complains that the Corps improperly concluded that its Technical Work Plan, although [redacted] Complaint ¶ 41.[7] It is the offeror's duty to submit an adequately written proposal for the agency to evaluate and that the offeror runs the risk of a lower rating if fails to do so. See, e.g., Johnson Controls, Inc., B-282326, 99-2 C.P.D. ¶ 6 (June 28, 1999); Maytag Aircraft Corp., B-278589, 2001 C.P.D. ¶ 121 (July 5, 2001).[8] This is especially true here because the RFP explicitly provided that an offeror's proposal ***"shall not merely offer to perform the work in accordance with, or simply repeat, the specifications, but shall discuss the actual methods proposed as specifically as possible."*** AR Tab 5 at 52 (emphasis supplied).

---

[7] The Corps found that GLDD's Technical Work Plan, on the other hand, was [redacted] AR Tab 31 at 1026, 1028.

[8] Intervenor recognizes that GAO decisions are not binding on this Court, but notes that the Court has accorded "deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions." Bean Stuyvesant, 48 Fed. Cl. at 326 n. 13 (citing cases).

Although Manson asserts that it was "careful not to simply repeat the specifications but to elaborate and discuss the actual methods it proposed to use" (Complaint ¶ 45), its proposal shows otherwise. For example, large portions of [redacted] (see AR Tab 14 at 634) repeat almost verbatim related specifications in Section 35 20 23.82 of the RFP. Manson's "discussion" of [redacted] essentially repeats the specification paragraphs entitled [redacted] Compare Manson [redacted] Tab 14 at 622-23 with RFP § 35 20 23.82 ¶¶ 3.2.3 [redacted] (AR Tab 5 at 310-311). For the Court's convenience, this portion of Manson's proposal and the RFP are reproduced at page 3 of the Appendix.

Manson provided no supplemental information on how it would accomplish these requirements. Therefore, the Corps' findings that Manson's [redacted] "repeated the requirements of [the] contract back" and that "there was no mention of systems to be used" were on the mark and well supported by the record. AR Tab 22 at 979.[9]

Unlike Manson, GLDD submitted a [redacted] that did not simply repeat the specifications and instead provided extensive detail on the [redacted]. Also unlike Manson,

[9] Page 4 of the Appendix sets forth additional portions of [redacted] that essentially repeat the related specifications.

GLDD submitted a [redacted]

Manson's challenge to the Corps' conclusion that portions of [redacted] fares no better. A good example is Manson's treatment of [redacted] The RFP (AR Tab 5 at 53) directed offerors to discuss the [redacted] as part of their Technical Work Plan. A review of the Technical Work Plan section of Manson's proposal, however, reveals that it is silent with respect to [redacted] except for a single reference to the [redacted] AR Tab 14 at 595. There is one explicit reference to [redacted] in the [redacted] section of Manson's proposal submitted in connection with the Performance Risk factor. Yet this reference is no more descriptive. Manson stated only that:

> [redacted]

AR Tab 14 at 640.

Manson provided no other detail -- nothing, for example about the [redacted][10] Therefore, the Corps was more than justified in finding that with respect to [redacted] Manson provided only a "very

[10] GLDD, on the other hand, submitted [redacted]

PROTECTED INFORMATION TO BE DISCL[redacted] ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDE[redacted] CLAIMS PROTECTIVE ORDER

brief explanation" and that Manson "state[d] they will use it, but don't give an explanation of exact equipment to be used." AR Tab 21 at 975, Tab 22 at 979.

Manson generally asserts (Complaint ¶¶ 43-45), without providing any explanation or citation to its proposal, that its work plan was specific enough and that it did not repeat the specifications. As shown above, these assertions are soundly refuted by the record. Manson's unsubstantiated disagreement with the judgments of the Corps' technical evaluators does not establish that the Corps was arbitrary and capricious. See Fru-Con Constr., 57 Fed Cl. at 485; Bean Stuyvesant, 48 Fed. Cl. at 329. Thus, the Corps reasonably considered the lack of detail and specificity in Manson's Technical Work Plan in assigning Manson a Satisfactory, but not an Excellent, rating under the Technical Work Plan factor.

### 2. The Corps Properly Considered The Size Of The Management Team Proposed By Manson

The Corps found that the project management team identified in Manson's Management Plan proposal, [redacted] AR Tab 31 at 1027; Tab 38 at 1541. In particular, the Corps found that Manson's proposed team was [redacted] AR Tab 31 at 1028.

Manson asserts that the assessment of [redacted] here was improper because there was nothing in the advertised source selection criteria to indicate that the size of the management team would be evaluated. Memo at 5, 15. Even a cursory review of the RFP demonstrates otherwise.

PROTECTED INFORMATION TO BE DISCLOS[redacted]LY IN ACCORDANCE WITH UNITED STATES COURT OF FEDER[redacted]AIMS PROTECTIVE ORDER

Section 00100 of the RFP set forth the "Source Selection Criteria, Instructions, Conditions and Notices to Offerors." AR Tab 5 at 49. Under Management Plan, this section explicitly provided that:

> Project Management Plans will be evaluated for realism and flexibility. ***Proposals will be evaluated on the qualifications, experience, and accomplishments (in resume format) of the offeror's project team. The following project team members shall be included:***

Id. at 51 (emphasis supplied). This provision then included a list of ***seven*** positions (eight if the offeror planned to use subcontractors directly related to dredging) and indicated that more than one resume could be submitted for various positions. Moreover, at page 00100-5 of the RFP, offerors were instructed that their plans must "***insure that the Contractor has at his/her disposal the organization and personnel required by the scope of work of the contract.***" Id. at 52 (emphasis supplied).

Thus, the RFP clearly and specifically advised offerors that the Corps would evaluate the "qualifications, experience and accomplishments" of the offeror's proposed team and whether that team provided "the organization and personnel required by the scope of the contract." Id. at 51-52. As such, the RFP explicitly permitted the Corps to consider whether the size of the proposed team provided sufficient organization and personnel to perform the contract's full scope of work.

Moreover, this Court repeatedly has recognized that "a solicitation need not identify each element to be considered by the agency during the course of an evaluation where such element is intrinsic to the stated factors." Banknote Corp. of America v. United States, 56 Fed. Cl. 377, 386

(2003); Bean Stuyvesant, 48 Fed. Cl. at 321 (citing cases).[11] Here [redacted] and properly was considered by the Corps.

[redacted] by asserting that it proposed [redacted]. A review of Manson's proposal, however, reveals that while Manson submitted [redacted] resumes, [redacted] of these resumes were for high level corporate management employees [redacted] who have responsibilities for many projects and are not dedicated to this project. AR Tab 14 at 667-679. The RFP (AR Tab 5 at 51) made clear that the project management team to be evaluated included only ***on site*** personnel by including positions such the project manager, shore crew superintendent and field engineers on the list of required resumes that would be evaluated. Moreover, the Corps' conclusion that [redacted] is confirmed by Manson's own Technical Work Plan proposal, which identifies its site staff as consisting of [redacted] AR Tab 14 at 636.

In contrast, GLDD proposed an on-site management team of [redacted] employees, not including [redacted]. Unlike Manson, GLDD also included a detailed [redacted]

[11] See, e.g., DSDJ, Inc., B-288438 et al., 2002 C.P.D. ¶ 50 at 7 (Oct. 24, 2001); NCLN 20, Inc., B-287692, 2001 C.P.D. ¶ 136 at 2 (July 25, 2001) (holding that agencies may take into account matters, although not expressly identified, that are logically encompassed by or related to the stated criteria).

**PROTECTED INFORMATION TO BE DISCLOSED ~~ONLY~~ IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

[redacted]. Id. at 915. The Corps concluded that this proposed team was [redacted] while Manson's team was [redacted] AR Tab 31 at 1028.

Manson also asserts that the Corps placed too much emphasis on [redacted] This assertion is belied by the evaluation record, which makes clear that [redacted] was not based solely on the [redacted] (discussed further below). AR Tab 31 at 1027-28.

**3. The Corps Properly Relied Upon Manson's Failure To Address The Shore Crew Superintendent Position As Required By The RFP**

Manson argues that it was improper for the Corps to assign [redacted] due to its failure to provide a resume for or to otherwise address the Shore Crew Superintendent position in its Management Plan proposal. Manson does not and cannot contend that it addressed this position: a review of Manson's Management Plan Proposal, reveals that Manson not only failed to submit a resume for this position, but that its proposal never even mentions this position. AR Tab 14 at 668-79.

Manson instead contends that the Corps' evaluation was improper because the Shore Crew Superintendent was not identified as a basis for evaluation in the RFP. Once again, Manson is incorrect. In fact, the proposal instructions on page 00100-4 of the RFP could not be more explicit:

> Proposals will be evaluated on the qualifications, experience, and accomplishments (in resume format) of the offeror's project team. The following project team members ***shall be included . . . Shore Crew Superintendent.***

AR Tab 5 at 51 (emphasis supplied).

The proposal instructions included this reference to the Shore Crew Superintendent because of its importance to successful performance of the project. This superintendent is in charge of the shore crew that manages the placement of material that is pumped from the Columbia River to upland disposal sites. This work includes monitoring the placement of fill and maintaining the disposal dikes to ensure that dredged material does not leak into other areas. The importance of this position is reflected in the bid schedule, which indicates that millions of cubic yards of dredged material must be placed in upland disposal areas by the shore crew supervised by this superintendent. AR Tab 5 at 45. Therefore, any assertion that the Corps was required to ignore Manson's complete failure to address this position in its proposal defies the terms of the solicitation and common sense.

In an effort to avoid the express language of the proposal instructions on page 00100-4 of the RFP (AR Tab 5 at 51), Manson contends that it was not required to identify a Shore Crew Superintendent because this position is not listed as a separate subfactor under the evaluation factors for award paragraph on page 00100-6 of the RFP. (Id. at 53) Complaint ¶¶ 15-17; Memo at 5. Manson's position, however, ignores the language on page 00100-5 of the RFP (part of the Evaluation Factors for Award paragraph, not the instructions to offerors), which required offerors to submit a Management Plan that will "insure that the Contractor has at his/her disposal the organization and personnel required to perform the scope of work." AR Tab 5 at 52. On a project where millions of cubic yards of the dredged material will be pumped to upland disposal

sites managed by the Shore Crew Superintendent, this position plainly is one that is necessary to perform the required scope of work and one that could be evaluated by the Corps.[12]

Manson's attempt to ignore the solicitation instructions also runs afoul of numerous decisions by this Court and by the GAO. This Court has recognized that the instructions to offers and evaluation factors for award sections of a solicitation (commonly referred to as Section L and Section M in the uniform contract format set forth in FAR 15.204 -1) should be read together to determine the scope of the evaluation. Allied Tech. Group, Inc. v. United States, 39 Fed. Cl. 125, 138 (1997).

Moreover, in Bean Stuyvesant, 48 Fed. Cl. at 334, this Court held that an offeror could not ignore specific, mandatory language in the instructions for offerors requiring the project manager to make the offeror's oral presentation (and that the agency could deduct points from the protestor's management score for failure to follow these instructions) even where the evaluation factors for award section did not assign points to this element. Bean Stuyvesant cited approvingly the GAO's decision in Anthony Hernandez, B-246104, 92-1 C.P.D. ¶ 146 (Feb. 4, 1992), where the GAO held that an agency properly lowered an offeror's rating when the offeror failed to comply with instructions regarding the submission of resumes even when the submission requirements were not an evaluation subfactor; Science & Tech., Inc., B-272748 et al., 97-1 C.P.D. ¶ 121 (Oct. 25, 1996) (where the instructions to offerors explicitly stated that the

[12] GLDD specifically [redacted]

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Phase Out Plan will be evaluated, but the Phase Out Plan was inadvertently omitted in the evaluation factors for award, offerors could not ignore the proposal instructions, and agency could evaluate Phase Out Plans).

Here the RFP specially advised Manson that the qualifications of its project management team would be evaluated and that the team members must include the Shore Crew Superintendent. Manson was not free to ignore the terms of the RFP, and the Corps acted reasonably in relying on Manson's failure to comply with this requirement.

**4. The Corps Properly Recognized Manson's Failure To Adequately Address Surveyors As Part Of Its Management Team**

Manson next complains (Complaint at ¶¶ 60-64; Memo at 5) that it should not have received [redacted] for failing to adequately discuss its surveyors for the project. This contention also is meritless.

Manson first asserts (Complaint ¶ 61) that the RFP contained no specific requirements concerning surveyors. To the contrary, both the instruction to offerors (page 00100-4) and evaluation factors for award (page 00100-6) paragraphs of the RFP specifically identified "Surveyors" as project management team members who would be evaluated under the Management Plan factor. AR Tab 5 at 51, 53.

Manson next contends that the Corps' evaluation was irrational because Manson's proposal "clearly identified ***the candidates for*** the quality control positions as Field Engineers with hydrographic [survey] experience." Complaint at ¶ 63 (emphasis supplied). The reference to "candidates" is telling because no where in its Management Plan proposal did Manson identify who would be responsible for performing and supervising surveys on the project. While the resumes of some of its project team members mention surveys, none of these individuals was

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

identified on Manson's project organization chart as being responsible for surveys on this project, and the Corps was left to guess regarding who would be performing and supervising survey work. AR Tab 14 at 668.

In comparison, GLDD did not leave the Corps guessing regarding GLDD's survey program and team. Unlike Manson's proposal, GLDD's Management Plan proposal contained a [redacted] Consistent with the RFP requirements, this description included surveyors and specifically identified [redacted] as responsible for supervising hydrographic and land surveys. AR Tab 17 at 887-89. The resumes of these individuals demonstrate that they have extensive experience in taking surveys and supervising survey operations. Id. at 907, 911.

In addition, GLDD's [redacted] unlike Manson's, identified the specific individuals responsible for taking surveys [redacted] Id.[13]

On page 5 of its Memo, Manson appears to attempt to explain its failure to adequately address its surveying team by asserting that "[s]urveyors are not typically considered to be management staff on dredging projects." Whether or not this is true, the RFP plainly advised offerors that Surveyors would be included in the evaluation of the project management team in

[13] In addition, GLDD's Technical Work Plan proposal included [redacted]

PROTECTED INFORMATION TO BE DISCLOSED [redacted]Y IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL [redacted]S PROTECTIVE ORDER

this procurement, and Manson ignored this at its risk. The Corps' evaluation of this aspect of Manson's proposal is consistent with the RFP, supported by the record, and reasonable.

### 5. Manson's Over-Reliance On Its [redacted] Rating On The Performance Risk Subfactor Is Misplaced

Manson contends (Memo at 4, 20) that it is "difficult to conceive" how the Corps could rate it [redacted] under the Performance Risk subfactor, but [redacted] under the Technical Work Plan and Management Plan factors. As a result, Manson asserts that the latter two ratings were arbitrary. This allegation is nonsense because, as the RFP explicitly stated, each of these evaluation factors addressed different subjects.[14] Therefore, the Corps properly evaluated these factors separately and assigned separate scores based on how Manson's proposal addressed each separate factor.

Indeed, Manson's attempt to double (or triple) count the rating it received under the Performance Risk subfactor is impermissible under the RFP's evaluation scheme. As the GAO has explained:

> an agency may not double count, triple count, or otherwise greatly exaggerate the importance of any one listed factor; stated differently, where an RFP lists a number of evaluation factors of stated importance, a single one cannot be accorded more than the weight prescribed in the RFP's evaluation methodology by the agency repeatedly considering the same factor in conjunction with the other major factors.

---

[14] As plainly set forth in the RFP (and recognized in ¶¶ 12-16 of Manson's Complaint), the Performance Risk factor focused on schedule, past performance, safety and small business subcontracting plan. AR Tab 5 at 50-51. The Technical Work Plan factor evaluated the offeror's proposed work plan for the project and identified entirely different subfactors, including nature of equipment, production rates, disposal plan and quality control. Id. at 49-50. The Management Plan factor likewise evaluated yet another separate requirement -- the offeror's proposal for managing the performance of the work and the qualifications of its key personnel. Id. at 51-52.

PROTECTED INFORMATION TO BE DISCLOS[redacted]LY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERA[redacted]IMS PROTECTIVE ORDER

J.A. Jones Mgmt. Serv., B-254941 et al., 94-1 C.P.D. ¶ 244 at 6 (Mar. 16, 1994); accord United Ammunition Container, Inc., B-275213, 97-1 C.P.D. ¶ 58 at 4 (Jan. 30, 1997).

### 6. Manson Has Completely Failed To Establish That It Should Have Received An Exceptional Rating On Either The Technical Work Plan Or Management Plan Factors

As demonstrated above, the Corps' evaluation of Manson's proposal on the Technical Work Plan and Management Plan factors was reasonable, in accordance with the RFP, and supported by flaws in Manson's proposal. Yet even if Manson was correct that it should have received fewer weaknesses (and Manson ***is not*** correct in this regard), Manson's protest is based on the false premise that if it submitted a proposal with a few strengths and few or no weaknesses, it is entitled to an Excellent rating.

The assignment of an adjectival or color ratings, however, is not a mechanical process of counting strengths and weaknesses and instead involves the exercise of qualitative judgment by the agency. Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 591, 613 (2006) (rejecting plaintiff's contention that the "total number of [strengths or weaknesses] must have significance" and finding that "nothing decrees that all strengths are created equal"); Cubic Defense Sys. Inc. v. United States, 45 Fed. Cl. 450, 469-70 (1999); Synetics v. United States, 45 Fed Cl. 1, 7 (1999). Moreover, both this Court and the GAO have consistently held that the mere fact that an offeror's proposal received strengths and no weaknesses does not entitle the offeror to a rating higher than Satisfactory. See Cubic Defense Sys., 45 Fed Cl. at 469-70 (denying protest challenging "acceptable" rating despite identified strengths in proposal because the "overall benefit of those strengths was "limited"); Fort Carson, 71 Fed. Cl. at 612 ("But a Court is hardly in a position to decide whether a proposal should be rated 'Outstanding' rather than

'Good' even given that the proposal is strong in all aspects. . . . This is exactly the sort of second-guessing that Courts should avoid"); KBM Group, Inc., B-281919 et al., 99-1 C.P.D. ¶ 118 (May 3, 1999) (protest against "acceptable" rating where proposal had a strength but no weaknesses denied).

In addition, this Court has recognized that an agency's assignment of adjectival ratings is entitled to a wide degree of deference, especially on technical matters. Cubic Defense Sys., 45 Fed. Cl. at 469-70. See CCL Serv., 48 Fed. Cl. at 120 (technical rating decisions are the "minutiae of the procurement process" which the court will not second guess). As explained in many GAO decisions,

> given the inherently subjective nature of the technical judgments of the [agency] evaluators, we think that it is best left to their discretion whether a particular proposal, for example, deserves a "good" as opposed to a "very good" rating. Stated differently, agency evaluators' judgments about the slight qualitative differences which can render a proposal "very good" (or exceptional) as opposed to "good" are not subject to rational legal objection unless a clear showing of unreasonableness is made.

CAS, Inc., B-260934 et al., 95-2 C.P.D. ¶ 239 at 6 (Sept. 12, 1995); accord EER Systems, Inc., B-290971.3 et al., 2002 C.P.D. ¶ 186 at 10 (Oct. 23, 2002).

Here, Manson has provided no basis whatsoever to second guess the qualitative judgments made by the Corps in assigning [redacted]atings, and its challenges to the Corps' evaluation of the Technical Work Plan and Management Plan factors must be denied.[15]

---

[15] To the extent that Manson is alleging bad faith or bias on the part of the Corps evaluators or the SSA (see Memo at 13), any such assertion should be summarily rejected. This court presumes that government officials act in good faith in the discharge of their duties, and its decisions often require "well-nigh irrefragable proof" of "specific intent to injure the plaintiff" or that the government was "motivated alone by malice." See, e.g., Avfel Servs. Inc. v. United

### E. The Corps' Cost/Technical Trade Off And Best Value Determination Were Reasonable And Supported By The Record

Manson's final contentions are that the Corps failed to conduct a fair cost/technical trade off analysis and ignored the price differential between Manson's and GLDD's offers in making an award to GLDD. Memo at 21-22. Both of these contentions are refuted by the AR and the extensive, detailed Source Selection Decision Document (SSDD). AR Tab 31.

Initially, the RFP explicitly provided that the contract would be awarded "to the firm submitting the proposal considered to be the best in terms of the technical evaluation factors and price" and that "the project will not be necessarily awarded to the firm submitting the lowest price proposal." AR Tab 5 at 49; see FAR 15.101-1 (describing the cost/technical trade off process and authorizing selection of higher rated, higher priced offerors).

Both the Federal Circuit and this Court have held that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cl. 1996); accord Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99, 108 (2003). In reviewing an agency's cost/technical trade off in a best value procurement, the issue is not whether this Court would balance the price and technical components differently, see Hydro Eng., Inc. v. United States, 37 Fed. Cl. 448, 470 (1997), but whether the agency's trade off was rational. In addition, this Court has held that it should not substitute its judgment for that of the source selection authority ("SSA") regarding the relative value of an offeror's price or technical advantage. See SDS Int'l v. United States, 48 Fed. Cl. 759, 769 (2001).

---

States, 70 Fed. Cl. 173, 210-211 (2005) (collecting cases). Manson has not and cannot offer any such proof here.

Consistent with these principles, both this Court and the GAO have upheld awards to higher priced/higher rated offerors in best value procurements. See, e.g., SDS Int'l., 48 Fed. Cl. at 769; Forestry Surveys and Data v. United States, 44 Fed. Cl. 493, 501 (1999) (finding that awardee's higher technical scores justified its 15% higher price); Overstreet Elec., 59 Fed. Cl. at 105-06, 119-20 (upholding award to offeror with price approximately 10% greater than protestor's price).[16]

The Corps' cost/technical trade off here was consistent with the RFP, rationally based and well documented. The SSA performed a careful and detailed review of the results of the technical and price evaluations, which are summarized in the SSDD, and properly concluded that "[t]here is a meaningful and substantive difference between the technical proposals which warrants consideration of awarding on other than the lowest-price offer." AR Tab 31 at 1028.

The SSA then identified, in the "Tradeoff Analysis" section of the SSDD, the significant advantages of GLDD's proposal on the non price evaluation factors. With respect to the Management Plan factor, on which GLDD received [redacted] rating and Manson received a [redacted] rating, the SSA noted that:

[redacted]

Id.

---

[16] See, e.g., KMPG Consulting LLP, B-290716, 2002 C.P.D. ¶ 196 (Sept. 23, 2003) (upholding award to bidder whose price was $13 million (65%) higher than protester's price).

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

The SSA also made detailed findings regarding the Technical Work Plan factor, on which GLDD received [redacted] rating and Manson received a [redacted] rating:

[redacted]

Id. at 1028-29.

On the Performance Risk factor, where [redacted] the SSA concluded that [redacted] Id. at 1029.[17]

[17] The RFP specifically stated that in evaluating past performance, the Corps would consider "how current and how relevant the information is." AR Tab 5 at 50.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

The SSA next considered the Price factor and specifically recognized that Manson had a [redacted] Id. The SSA recognized, however that the lowest price offeror is not always the best value, especially if that offeror had not carefully examined or planned out the work. The SSA then concluded that in this case, GLDD's stated advantages in the "non price factors warrant paying the price differential presented" because:

> Overall, GLDD has submitted a superior proposal, offering an excellent management team and a clear and detailed plan with a proven track record to execute it. GLDD offers the highest degree of certainty of being able to complete this important portion of the Columbia River Channel Improvement Project delivering quality work, on or ahead of schedule and at or under budget while minimizing the probability of unanticipated difficulties, disruption of the work and contract claims.

Id. Therefore, the SSA determined that GLDD's offer "taking price and non-price factors into account represents the best value to the Government." Id.

Manson's primary challenge to the Corps' cost/technical trade off (Memo at 21-22) is based on its other challenges to the evaluation of its proposal. Manson asserts that because there was no rational basis for its [redacted] ratings on the Technical Work Plan and Management Plan subfactors, it should have received an overall Excellent rating on the non-price factors and that its lower price should have been determinative. Complaint ¶ 67; Memo at 21.

The prior sections of this brief refute each of Manson's challenges to the evaluation of its proposal. As described in detail above, the record and the SSDD plainly point out the real and significant distinctions between the offerors' proposals that justified their different ratings. The Corps' conclusion that [redacted] is rational and supported by the record, and this aspect of Manson's challenge to the cost/technical trade off must be rejected.

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDA[redacted]WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIV[redacted]RDER**

Manson's other assertion is that the Corps' cost/technical trade off discounted or did not adequately consider the price factor. This is squarely refuted by the SSDD, which summarized the price evaluation in detail, specifically noted that Manson had a [redacted] and expressly concluded that the "non-price factors warrant paying the price differential presented." Id. at 1029.

## IV. CONCLUSION

For all of the reasons stated above, Manson has failed to meet its burden of proving that the Corps' decision to award the contract to GLDD was irrational, arbitrary and capricious or a clear and prejudicial violation of applicable procurement laws and regulations. Manson has not succeeded on the merits of its claim and therefore is not entitled to any of the relief that it seeks.[18] Therefore, GLDD respectfully requests that Manson's motions be denied and that Manson's Complaint be dismissed with prejudice.

Respectfully submitted,

s/Daniel C. Sauls

Daniel C. Sauls
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

**Attorney of Record for Great Lakes Dredge & Dock Company LLC**

[18] At the September 27, 2007 intial status conference, the Court asked the parties to address an issue regarding the scope of injunctive relief assuming, for purposes of argument only, that Manson's claims had any merit. GLDD understands that the Government will be addressing this issue in the brief that it is filing today.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**<u>OF COUNSEL</u>**

Thomas P. Barletta
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

Dated: October 5, 2007

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

# APPENDIX

## Index


| | Description | Pages |
|---|---|---|
| 1. | FAR 15.404-1(g) (2007) and FAR 15.814 (1997) | 1-2 |
| 2. | Comparison of Portions of Manson's Proposal to Portions of the RFP | 3-4 |


PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCOR[redacted]CE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECT[redacted]ORDER

technical analysis of the proposed types and quantities of materials, labor, processes, special tooling, facilities, the reasonableness of scrap and spoilage, and other associated factors set forth in the proposal(s) in order to determine the need for and reasonableness of the proposed resources, assuming reasonable economy and efficiency.

(2) At a minimum, the technical analysis should examine the types and quantities of material proposed and the need for the types and quantities of labor hours and the labor mix. Any other data that may be pertinent to an assessment of the offeror's ability to accomplish the technical requirements or to the cost or price analysis of the service or product being proposed should also be included in the analysis.

(f) *Unit prices.*

(1) Except when pricing an item on the basis of adequate price competition or catalog or market price, unit prices shall reflect the intrinsic value of an item or service and shall be in proportion to an item's base cost (*e.g.*, manufacturing or acquisition costs). Any method of distributing costs to line items that distorts the unit prices shall not be used. For example, distributing costs equally among line items is not acceptable except when there is little or no variation in base cost.

(2) Except for the acquisition of commercial items, contracting officers shall require that offerors identify in their proposals those items of supply that they will not manufacture or to which they will not contribute significant value, unless adequate price competition is expected (10 U.S.C. 2304 and 41 U.S.C. 254(d)(5)(A)(i)). Such information shall be used to determine whether the intrinsic value of an item has been distorted through application of overhead and whether such items should be considered for breakout. The contracting officer may require such information in all other negotiated contracts when appropriate.

(g) *Unbalanced pricing.*

(1) Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques. The greatest risks associated with unbalanced pricing occur when—

(i) Startup work, mobilization, first articles, or first article testing are separate line items;

(ii) Base quantities and option quantities are separate line items; or

(iii) The evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract.

(2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government. [FAC 97-2, 62 FR 51224, 9/30/97, effective 10/10/97; FAC 97-9, 63 FR 58587, 10/30/98, effective 10/30/98; FAC 97-14, 64 FR 51828, 9/24/99, effective 9/24/99, finalized without change, FAC 97-17, 65 FR 24316, 4/25/2000; FAC 97-16, 65 FR 16274, 3/27/2000, effective 3/27/2000; FAC 2005-14, 71 FR 67779, 11/22/2006, effective 11/22/2006]

## 15.404-2 Information to support proposal analysis.

(a) *Field pricing assistance.*

(1) The contracting officer should request field pricing assistance when the information available at the buying activity is inadequate to determine a fair and reasonable price. The contracting officer must tailor requests to reflect the minimum essential supplemen-



©2007 CCH. All Rights Reserved.

head and whether such items should be considered for breakout. The contracting officer may require such information in any other negotiated contracts when appropriate. [FAC 84-28, 52 FR 21886, 6/9/87, effective 4/16/87; FAC 90-4, 56 FR 15150, 4/15/91, effective 5/15/91; FAC 90-12, 57 FR 39587, 8/31/92, effective 8/31/92; FAC 90-32, 60 FR 48206, 9/18/95, effective 10/1/95; FAC 90-45, Final rule, 62 FR 224, 1/2/97, effective 1/1/97]

**[¶ 30,163.10]**

**15.812-2 Contract clause.**

(a) The contracting officer shall insert the clause at 52.215-26, Integrity of Unit Prices, in all solicitations and contracts for other than—

(1) Acquisitions at or below the simplified acquisition threshold;

(2) Construction or architect-engineer services under Part 36;

(3) Utility services under part 41;

(4) Service contracts where supplies are not required.

(5) Acquisitions of commercial items; and

(6) Contracts for petroleum products.

(b) The contracting officer shall insert the clause with its *Alternate I* when contracting without full and open competition or when prescribed by agency regulations. [FAC 84-18, 51 FR 27120, 7/29/86, effective 7/30/86; FAC 84-28, 52 FR 21887, 6/9/87, effective 4/16/87; FAC 90-4, 56 FR 15150, 4/15/91, effective 5/15/91; FAC 90-23, 59 FR 67010, 12/28/94, effective 2/27/95; FAC 90-29, 60 FR 34732, 7/3/95, effective 7/3/95; FAC 90-45, Final rule, 62 FR 224, 1/2/97, effective 1/1/97]

**[¶ 30,163.20]**

**15.813 [Reserved]**

**[¶ 30,163.50]**

**15.814 Unbalanced offers.**

(a) Offers shall also be analyzed to determine whether they are unbalanced with respect to prices or separately priced line items. This is particularly important when evaluating the relationship of the price for first article tests or test items to the price for the production units, and in evaluating the prices for options in relationship to the prices for the basic requirement.

(b) An offer is mathematically unbalanced if it is based on prices which are significantly less than cost for some contract line items and significantly overstated in relation to cost for others. An offer is materially unbalanced if it is mathematically unbalanced, and if—

(1) There is a reasonable doubt that the offer would result in the lowest overall cost to the Government, even though it is the lowest evaluated offer; or

(2) The offer is so grossly unbalanced that its acceptance would be tantamount to allowing an advance payment.

(c) Offers that are materially unbalanced may be rejected.

(d) Depending on the nature of the acquisition, contracting officers shall use either price analysis or cost analysis techniques, or a combination of the two techniques, to determine if offers are materially unbalanced. The following are examples of techniques that can be used to determine if an offer is unbalanced. Although these examples specifically relate to first article testing, they may also be used for other procurements where unbalanced offers may be of concern.

(1) Compare all offers to determine if the offerors have significantly higher prices for the first articles than for the production units. The comparison should consider whether the Government or the contractor will perform the first article test.

(2) For an individual offer, compare the relationship of first article prices to prices for production items. The cost to the offeror for first articles may be estimated (i) by comparing the total price offered, including the first article to an alternate proposal by the same offeror which does not include first article testing (see 9.306(d)); or (ii) if cost data has been submitted, by reviewing certain elements of cost to determine, for instance, whether manufacturing and special tooling, and test equipment costs, are prorated among the first articles and the production units, or are only applied to the first articles. If cost data are not available, it may be necessary for contracting officers to estimate contractor costs. [FAC 84-58, 55 FR 25529, 6/21/90, effective 7/23/90]

| [redacted] | [redacted] |
| --- | --- |
| [redacted]<br><br>[redacted]<br><br>[redacted]<br><br>[redacted] | [redacted]<br><br>[redacted]<br><br>[redacted] |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER