10/19/07
Agreed Upon Redacted Copy
May Be Made Public

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MANSON CONSTRUCTION CO.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>v.<br><br>GREAT LAKES DREDGE & DOCK CO. LLC<br><br>Intervenor-Defendant. | Electronically Filed On<br>October 9, 2007<br><br>No.:07-694C<br>(Judge Christine Miller) |

**INTERVENOR GREAT LAKES DREDGE & DOCK COMPANY LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REPLY MEMORANDUM IN SUPPORT OF GREAT LAKES' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Daniel C. Sauls
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Attorney of Record for Intervenor
Great Lakes Dredge &
Dock Company LLC

Of Counsel:
Thomas P. Barletta
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Date: October 9, 2007

PROTECTED INFORMATION TO BE DISCLOS[redacted]Y IN ACCORDANCE WITH UNITED STATES COURT OF FEDERA[redacted]IMS PROTECTIVE ORDER

## TABLE OF CONTENTS


Page

I. STATEMENT OF ISSUES ....1

II. STATEMENT OF FACTS/STATEMENT OF THE CASE ....1

III. ARGUMENT ....1

A. Manson's Contention That Price Should Have Been The Only Discriminator Must Be Rejected ....2

B. Manson's Additional Challenges To The Corps' Non Price Evaluation Are Meritless ....5

1. Manson's Assertion That The Source Selection Decision Was Made Before Asking Clarification Questions And Receiving Responses Is Wrong ....5

2. The Corps' Evaluation Was In Compliance With The Evaluation Plan ....6

3. Manson's Assertion That The Corps Placed Too Much Importance On The Level Of Detail In The Proposals Is Meritless ....8

4. Manson's Contention That Its Proposal Was Not Properly Evaluated Under Three Subfactors Of The Technical Work Plan Factor Is Without Merit ....9

a. The Corps Properly Evaluated Manson's Disposal Plan ....9

b. The Corps' Evaluation Regarding Coordination With Columbia River Pilots Was Reasonable And Is Supported By The Record ....13

c. The Corps Properly Evaluated Manson's QC Plan ....14

5. The Corps Properly Found That Manson's Proposal Did Not Provide An Adequate Plan [redacted] ....15

6. The Corps Properly Evaluated Performance Risk And Past Performance ....17

C. Manson's Contentions Regarding The Source Selection Decision And Cost/Technical Trade Off Are Without Merit And Must Be Rejected ....18

1. Manson's Allegations Regarding Paragraph 9 Of The SSDD Provide No Basis To Challenge The Cost/Technical Trade Off Or The Selection Decision ....19

2. Manson's Challenges To The Cost/Technical Trade Off Are Meritless ....23

D. Plaintiff Is Not Entitled To Injunctive Relief ....26

IV. CONCLUSION ....27


**PROTECTED INFORMATION TO BE DISCLOSED ONLY [redacted] ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS [redacted] OTECTIVE ORDER**

## TABLE OF AUTHORITIES

**FEDERAL CASES** Page(s)

Argencord Mach. & Equip., Inc. v. United States,
68 Fed. Cl. 167 (2005) ....................3

Bean Stuyvesant LLC v. United States,
48 Fed. Cl. 303 (2000) ....................14

Blue & Gold Fleet, L.P. v. United States,
492 F.3d 1308 (Fed. Cir. 2007)....................3, 18

C & L Construction Co. v. United States,
6 Cl. Ct. 791 (1984) ....................6

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) ....................8, 9

Computer Sciences Corp. v. United States,
51 Fed. Cl. 297 (2002) ....................24

Dismas Charities, Inc. v. United States,
61 Fed. Cl. 191 (2004) ....................24

DynCorp International LLC v. United States,
76 Fed. Cl. 528 (2007) ....................20, 21

E. W. Bliss Co. v United States,
77 F.3d 445 (Fed. Cir. 1996)....................9

Erinys Iraq Ltd. v. United States,
No. 07-562C, 2007 WL 2714167 (Fed. Cl. Sept. 14, 2007)....................3

Fru-Con Constr. Co. v. United States,
57 Fed. Cl. 483 (2003) ....................14

Information Sciences Corp. v. United States,
73 Fed. Cl. 70 (2006) ....................24

JWK International Corp. v. United States,
279 F.3d 985 (Fed. Cir. 2002)....................2, 21

Rig Masters, Inc. v. United States,
70 Fed. Cl. 413 (2006) ....................20, 21

## COMPTROLLER GENERAL CASES


Antenna Prods. Corp., B-236933, 90-1 C.P.D. ¶ 82 (Jan. 22, 1990) ....... 7

Century Elevator Inc., B-283822, 99-2 C.P.D. ¶ 112 (Dec. 20, 1999) ....... 20

Delta Dental of California, B-296307, 2005 C.P.D. ¶ 152 (July 28, 2005) ....... 7

DTH Mgmt. JV, B-283239, 99-2 C.P.D. ¶ 68 (Oct. 6, 1999) ....... 7

HDL Research Lab, Inc., B-294959, 2005 C.P.D. ¶ 8 (Dec. 21, 2004) ....... 21

Hydro Research Science, Inc., B-230208, 88-1 C.P.D. ¶ 517 (May 31, 1988) ....... 2

Renaissant Dev. Corp., B-260947, 95-2 C.P.D. ¶ 58 (Aug. 7, 1995) ....... 7

SAMS El Segundo, LLC, B-291620, et al., 2003 C.P.D. ¶ 44 (Feb. 3, 2003) ....... 24

Synectic Solutions, Inc., B-299086, 2007 C.P.D. ¶ 36 (Feb. 7, 2007) ....... 21


## REGULATIONS


FAR 15.304(c) ....... 2

FAR 15.306(a) ....... 20

FAR 15.306(c) ....... 22

FAR 15.306(c)(1) ....... 20

FAR 15.306(d)(3) ....... 22

FAR 15.307 ....... 22

FAR 15.308 ....... 24

FAR 52.215-1 ....... 20

FAR 52.215-1(f)(4) ....... 20

## I. STATEMENT OF ISSUES

Intervenor Great Lakes Dredge & Dock Company LLC ("GLDD") refers the Court to the Statement of Issues set forth on page 1 of its Memorandum filed on October 5, 2007. ("GLDD 10/5 Memo"). In addition, pursuant to RCFC 5.2(a)(2), GLDD agrees with the additional statement of issues set forth in plaintiff Manson Construction Company's ("Manson") October 5, 2007 Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record ("Manson 10/5 Memo").

## II. STATEMENT OF FACTS/STATEMENT OF THE CASE

GLDD refers the Court to Statement of Facts set forth on pages 1-5 of its 10/5 Memo and designates those pages as its Counter Statement of Facts.

## III. ARGUMENT

Manson's 10/5 Memo repeats many of the arguments made in its Complaint and in its September 26, 2007 Memorandum in Support of its Motion for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Declaratory Judgment. ("9/26 Memo").[1] The Government and GLDD already have addressed and refuted these contentions in their 10/5 Memos, and GLDD will not repeat those arguments here. GLDD does note, however, that Manson's 10/5 Memo (at 14 and 19): 1) concedes that the Corps' evaluation considered Manson's clarification response regarding the Martin Bar disposal area; and 2) admits that Manson's failure to include the required mob/demob cost breakdown in the proposal that it

---

[1] See Manson 10/5 Memo at 15-16 (allegation that Manson's proposal did not repeat the specifications); 16-19 (allegation that Manson's clarification responses were ignored by the Corps); 17 (allegation that Satisfactory ratings on the Technical Work Plan and Management Plan factors were inconsistent with Manson's Excellent rating on Performance Risk); 17-19 (allegations regarding size of management team, Shore Crew Superintendent and Surveyors); 19-20 (allegations regarding mob/demob cost breakdown and unbalancing).

submitted to the Corps had no effect on the Corps' decision to award the contract to GLDD. Therefore, Manson's claims relating to these issues must be rejected.

The remainder of this Memorandum focuses on new arguments raised by Manson in its 10/5 Memo. As demonstrated below, these arguments provide no basis for disturbing the Corps' decision to award the contract to GLDD.

### A. Manson's Contention That Price Should Have Been The Only Discriminator Must Be Rejected

A persistent theme in Manson's 10/5 Memo (at 4-5, 12-13) is Manson's contention that, given the nature of the work called for by the RFP, the source selection decision should have been based solely on price. However, that contention reflects a fundamental misunderstanding of this procurement and therefore must be rejected.

As Manson concedes (id. at 9), the RFP specifically provided for a best value procurement where award could be made to other than the low-priced offeror. See AR Tab 5 at 49. The RFP identified four evaluation factors, one of which was price, and further provided that the non-price factors were approximately equal in importance to price. Id. at 49-53.

The identification of evaluation factors and assignment of their relative weights is a matter within the broad discretion of the agency. FAR 15.304(c); see, e.g., JWK International Corp. v. United States, 279 F.3d 985, 988 (Fed. Cir. 2002) (stating that "the agency has full discretion to rank the importance of the [evaluation] factors," including cost); Hydro Research Science, Inc., B-230208, 88-1 C.P.D. ¶ 517 at 2 (May 31, 1988) (holding that "the selection and weights of evaluation criteria . . . are within the broad discretion entrusted to agency procurement officials").

Moreover, if Manson believed that price should have been the "true discriminator" in the source selection given the nature of the work, it was required to raise that objection prior to the date for submission of proposals, and its attempt to do so now is untimely. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007); Erinys Iraq Ltd. v. United States, No. 07-562C, 2007 WL 2714167 at *16 (Fed. Cl. Sept. 14, 2007).[2]

In addition, Manson's various contentions as to why award should have been based solely on price are simply unfounded. For example, it baldly asserts that the Corps believed that "the technical merit and technical approach of the offerors would not require an evaluation" and that therefore "there were no evaluation factors in the solicitation that addressed those issues." (10/5 Memo at 4) This is a complete mischaracterization of the RFP, as Manson's own Memos demonstrate. The RFP, for example, plainly stated that the offerors would be rated under the Technical Work Plan factor on their "proposed project work plan to determine if it is consistent with the scope of work," AR Tab 5 at 49, and that the Corps would also evaluate "how effectively and completely" the offeror's Technical Work Plan discussed various elements of the work, including equipment, production rates, disposal plan, and quality control measures. Id. at 49-50, 53. See also id. at 52 (stating that "[t]he proposal shall not merely offer to perform the work in accordance with . . . the specifications, but shall discuss the actual methods proposed as specifically as possible").

---

[2] Likewise, the fact that the Corps frequently procures dredging work via sealed bid procurements under FAR Part 14 is irrelevant. As Manson concedes (10/5 Memo at 4; 9/26 Memo at 12), any suggestion that the Corps should have used a sealed bid rather than a negotiated best value procurement here is also untimely. See Blue & Gold Fleet, 492 F.3d at 1313-15; Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n. 14 (2005) (allegation in post-award protest that the solicitation should have been issued as IFB rather than RFP is untimely).

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN AC[redacted]DANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROT[redacted]VE ORDER**

More fundamentally, Manson's characterization of the work as "essentially involv[ing] the operation of an excavation tool to dig dirt" grossly oversimplifies the requirement here. The work did not simply involve "digging dirt" but required the contractor to dredge the main channel of the Columbia River, a commercially important and active shipping channel, and to do so under potentially adverse weather conditions and subject to strict environmental constraints. The RFP, which was over 500 pages long, included detailed specifications and requirements for the dredging operations and related efforts such as in-water and upland disposal, quality control and environmental compliance. Further, many of those specifications and requirements were specific to work on the Columbia River. See, e.g., AR Tab 5 at 302-328. Moreover, the RFP specifically informed the offerors that their proposals "shall reflect an understanding of the work environment, contract requirements [and] technical approaches," and, as noted above, that the Corps would evaluate "how effectively and completely" the offeror's technical work plan discussed various elements performing the work. Id. at 49, 52.

Manson's simplistic description of the work required by the RFP demonstrates a failure to comprehend the RFP's requirements and is indicative of why Manson's non price proposal was rated as only Satisfactory. It also demonstrates that Manson either ignored or failed to the take the RFP seriously in preparing its proposal. The RFP explicitly provided that the Corps would "evaluate solely on the information provided in the proposal and will not assume that an offeror possesses any capability unless specified in the proposal." AR Tab 5 at 51. Nevertheless, Manson apparently presumed that: (1) the Corps would have to treat it as being capable as any other offeror of executing the requirements of the RFP on the Columbia River simply because Manson was an established dredging company; and (2) that the award would therefore come down to price. However, that is not what the RFP here said, and the Corps

properly evaluated the offers it received based on all of the evaluation factors (price and non price) set forth in the RFP.

### B. Manson's Additional Challenges To The Corps' Non Price Evaluation Are Meritless

#### 1. Manson's Assertion That The Source Selection Decision Was Made Before Asking Clarification Questions And Receiving Responses Is Wrong

Manson repeatedly -- and erroneously -- asserts in its 10/5 Memo that the Source Selection Decision was made on August 30, 2007, before the Corps sought clarifications from Manson. Manson 10/5 Memo at 5, 10, 16, 22. This contention is refuted by the Source Selection Decision Document ("SSDD") and by Manson's own 10/5 Memo. First, although page 1 of the SSDD (AR Tab 31 at 1024) bears the date of "30 August 2007," this is simply the date that work on the document started. Page 6 of the SSDD makes clear that it was signed by the Source Selection Authority ("SSA") on September 6, 2007, ***after*** receipt and consideration of Manson's clarification responses. Id. at 1030.

Moreover, as pointed out in GLDD's 10/5 Memo at 11, Manson's September 4 response regarding use of the Martin Bar disposal area is specifically addressed in the text of the SSDD. Id. at 1028-29. Manson has not explained how a source selection decision that relied upon Manson's September 4 response could have been made on August 30. Indeed, Manson's 10/5 Memo (at 14) itself concedes that the SSA considered this clarification response in the SSDD.

Therefore, Manson's assertions about the timing of the source selection decision, and its contention that this timing indicates arbitrary and capricious conduct, must be rejected.[3]

### 2. The Corps' Evaluation Was In Compliance With The Evaluation Plan

Manson's next assertion (10/5 Memo at 10) that the Corps' technical evaluation did not follow its Evaluation Plan (AR Tab 6), fares no better.[4] As noted above, contrary to Manson's repeated suggestions that price should have been the only evaluation factor, the Evaluation Plan specifically provided for evaluation of four factors -- Technical Work Plan, Performance Risk, Management Plan and Price -- and the record demonstrates that the Corps evaluated proposals on all four factors. AR Tab 6 at 543; Tab 21-24; Tab 31. With respect to the evaluation of the non price factors, the Technical Evaluation Team ("TET") not only followed the Evaluation Plan, they rated offerors proposals using forms contained in the Evaluation Plan that set forth the evaluation criteria to be used. AR Tab 6 at 547-550; Tabs 21-24 at 974-992.

Manson's single alleged "deviation" from the Evaluation Plan is that the TET consisted of two members instead of three. Manson 10/5 Memo at 10. However, it is well established that an alleged deviation from an agency's source selection plan ("SSP") or other internal agency guidance is not a valid basis for protest. See C & L Construction Co. v. United States, 6 Cl. Ct.

---

[3] Manson also complains (10/5 Memo at 22) that the Technical Evaluation Team ("TET") completed its evaluation before the Corps requested clarifications. However, it is undisputed that the Manson's clarification responses were considered fully by the SSA. Id. at 1028-29. Moreover, Manson has not and cannot demonstrate any prejudice from the alleged failure of the TET to consider this clarification response given the SSA's full consideration of this issue in the SSDD.

[4] Manson asserts, without citation, that the RFP "incorporated" the Evaluation Plan. Manson 10/5 Memo at 9. This is incorrect. See AR Tab 5.

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN AC[redacted]NCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROT[redacted]VE ORDER**

791, 804 (1984); Delta Dental of California, B-296307, 2005 C.P.D. ¶ 152 at 19 (July 28, 2005); Antenna Prods. Corp., B-236933, 90-1 C.P.D. ¶ 82 at 4 (Jan. 22, 1990). The rationale for this rule is that:

> [T]he requirements stated in evaluation and source selection plans . . . are internal agency instructions, not disclosed to offerors in the solicitation, and thus, do not give outside parties any rights. Instead, we look to the solicitation that was disseminated to the offerors as the touchstone for whether those offerors were treated fairly in an evaluation.

DTH Mgmt. JV, B-283239, 99-2 C.P.D. ¶ 68 at 4 (Oct. 6, 1999) (internal citation omitted).

In addition, this rule has been applied to the very argument that Manson makes here. In Renaissant Dev. Corp., B-260947, 95-2 C.P.D. ¶ 58 at 7 (Aug. 7, 1995), the GAO rejected a protest to an evaluation completed by two evaluators instead of the three to five evaluators specified in SSP, finding that the attempted reliance on the SSP was not a valid basis for protest. Moreover, the record here establishes that the two TET members carefully reviewed the offerors' proposals, rated the proposals using the methodology set forth in the Evaluation Plan, documented their findings, and identified real and significant distinctions between the proposals. AR Tabs 21-24 (974-992); AR Tab 31 at 1028 ("[t]here is a meaningful and substantive difference between the technical proposals").[5] For all of these reasons, Manson's protest regarding the number of evaluators must be rejected.

---

[5] Manson asserts (10/5 Memo at 13) that its ratings equaled or exceeded GLDD's ratings on [redacted]echnical work plan subfactors. A review of the evaluation worksheets confirms that GLDD received higher ratings on [redacted] while Manson received a higher rating than GLDD on [redacted] AR Tabs 21-24 (974-992). GLDD's advantage was even greater under the Management Plan factor, where [redacted] Id. Of course, as pointed out in GLDD's 10/5 brief at 30-31, an

### 3. Manson's Assertion That The Corps Placed Too Much Importance On The Level Of Detail In The Proposals Is Meritless

On page 11 of its 10/5 Memo, Manson asserts, without citation or record support, that the Corps placed too much reliance on the level of detail in the offerors' proposals in evaluating the Technical Work Plans. The RFP, however, explicitly advised offerors that

- The Corps would evaluate "how ***effectively and completely***" the offeror's Technical Work Plan addressed the required elements. AR Tab 5 at 49 (emphasis supplied);

- The Technical Work Plan proposal "shall not merely offer to perform the work in accordance with, or simply repeat, the specifications, ***but shall discuss the actual methods proposed as specifically as possible.***" Id. at 52 (emphasis supplied); and

- PROPOSALS . . . MUST INCLUDE SUFFICIENT DETAILED DATA AND PLANS TO BE EVALUATED UNDER THESE CRITERIA. OMITTED AND AMBIGUOUS DATA WILL RESULT IN PROPOSALS RECEIVING LOWER SCORES. Id. (emphasis in original).

Therefore, the RFP plainly warned Manson that the level of detail provided was an important component of the Technical Work Plan evaluation. This is confirmed by the Evaluation Plan adjectival rating definitions (which Manson has not challenged), which also focus on the level of detail contained in an offeror's plan. AR Tab 6 at 545.

For these reasons, Manson's contention that the Corps relied too heavily on the lack of detail in Manson's proposal (or conversely relied too heavily on the greater level of detail in GLDD's "very descriptive" and "[d]etailed" proposal (AR Tab 31 at 1026)) must be rejected.[6]

---

agency's assignment of adjectival ratings to offerors on technical matters is entitled to a wide degree of deference. See e.g., CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000).

[6] The lack of detail in Manson's proposal is discussed in Defendant's Motion for Judgment upon the Administrative Record ("Gov't 10/5 Memo") at 20-22 and in GLDD's 10/5 Memo at 20-21. In addition to the lack of detail about [redacted] described there, the

### 4. Manson's Contention That Its Proposal Was Not Properly Evaluated Under Three Subfactors Of The Technical Work Plan Factor Is Without Merit

Manson contends (10/5 Memo at 13) that its proposal was not properly evaluated [redacted] As shown below (and in the Gov't and GLDD 10/5 Memos for arguments that Manson has repeated), the Corps' evaluation under each of these subfactors was reasonable and well supported by the record. Moreover, this Court has recognized that such challenges to the agency's technical rating decisions are the "'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess.'" CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (Fed. Cir. 2000) (quoting E. W. Bliss Co. v United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

#### a. The Corps Properly Evaluated Manson's Disposal Plan

On pages 13-15 of its 10/5 Memo, Manson attempts to challenge the Corps' reliance on weaknesses in Manson's [redacted] as a basis for the source selection decision. Manson makes four arguments. The first two essentially repeat arguments Manson has made previously that have been refuted by the Government and GLDD.[7] The first "new" argument made by

---

TET's evaluation worksheets mention lack of detail in Manson's Technical Work Plan proposal in the following additional areas: [redacted]

[7] Manson again complains about the alleged lack of consideration of its clarification response regarding use of the Martin Bar disposal area, but now concedes that its clarification response was considered in the SSDD. 10/5 Manson Memo at 14. See Gov't 10/5 Memo at 14-15; GLDD 10/5 Memo at 10-13. Manson also repeats its previous argument (Complaint ¶¶ 41-45) that its Disposal Plan was sufficiently detailed and did not merely repeat the specifications. This argument is refuted in the Gov't 10/5 Memo at 20-22 and in GLDD's ~~10~~/5 Memo at 18-21

Manson with respect to the evaluation of its Disposal Plan is based on the assertion that it was improper for the Corps to consider the [redacted] that Manson proposed to use because this was not identified in the RFP as an evaluation factor or subfactor. Manson 10/5 Memo at 14. However, Manson once again ignores the plain terms of the RFP.

The RFP specifically identified "Disposal Plan" as a subfactor under the Technical Work Plan factor. AR Tab 5 at 53. In addition, the RFP explicitly advised offerors that the Corps would "evaluate how effectively and completely" the offeror's Technical Work Plan discussed the offeror's "[d]isposal plan for dredged material ***including . . . [u]pland disposal sites to be used and estimated quantity disposed in each.***" Id. at 49 (emphasis supplied). Thus, the RFP explicitly stated that the Corps would evaluate which upland sites Manson proposed and the quantity of material that Manson proposed to put in each site, and this is precisely what the Corps did here.

The TET and the SSDD specifically noted that Manson proposed to use only [redacted] available upland disposal sites. AR Tab 22 at 979; Tab 31 at 1026. Manson's proposal stated that it would use [redacted]

As previously discussed (GLDD 10/5 Memo at 10-13), the Corps pointed out to Manson that the Corps estimated that the maximum capacity of the Martin Bar disposal site was only 1 million cubic yards. AR Tab 30 at 1018. In its clarification response, Manson conceded that the

---

and Appendix pages 3-4, which demonstrate that much of Manson's [redacted] was copied almost verbatim from the specifications.

capacity of the Martin Bar disposal area, according to its calculations, was only 1,105,000 cubic yards. AR Tab 30 at 1021. Its response, however, failed to adequately explain, given the limited capacity at Martin Bar and the fact that it had proposed to use only [redacted] upland disposal area for the base work, where and how it would place all of the material that would have to be placed upland under the base work contract. AR Tab 31 at 1028. The Corps properly considered this in its evaluation.

Manson's final contention about the evaluation of its Disposal Plan is based on its assertion that the SSA "misunderstood" Manson's clarification response with respect to what Manson would do with material that did not fit into to the Martin Bar disposal area. The entire "mitigation plan" set forth in Manson's clarification response was [redacted] Manson's 10/5 Memo addresses only the second alternative [redacted] Manson argues that the Corps "misunderstood" Manson's use of "[redacted]" and that this "misunderstanding" constituted arbitrary and capricious conduct. Manson 10/5 Memo at 14. This contention is meritless.

The Corps understood the reference to [redacted] Manson now suggests that it meant that it would [redacted] The Corps' interpretation of Manson's clarification response was perfectly reasonable.

Manson's proposal for upland disposal was based on [redacted] AR Tab 14 at 622. Manson's

clarification response did ***not*** state that Manson would [redacted]. Instead, Manson said, without further explanation, that it would [redacted] Therefore, the Corps reasonably concluded that this would involve a different approach than Manson's normal work plan and would require [redacted][8]

Moreover, to the extent that there was any ambiguity in Manson's response, the responsibility for that ambiguity lies with Manson. The Corps noted an obvious issue with Manson's proposal as submitted, which stated that Manson planned to pump into the Martin Bar disposal area more than double that site's capacity. Although not required to do so, the Corps asked Manson to clarify this matter, but Manson's response (quoted above) was cryptic and lacked detail [redacted]

In addition, Manson ignores another significant problem with its clarification response, which is identified in the SSDD. Manson said it would [redacted] AR Tab 30 at 1021. Manson's reference to [redacted] was in direct contravention of the RFP, which required offerors to identify in their Disposal Plans the "[u]pland disposal sites to be used and estimated quantity disposed of in each." AR Tab 5 at 49. The SSDD specifically noted Manson's reliance on [redacted] and failure to [redacted] in finding Manson's

[8] Manson's reliance on the use of the [redacted]

clarification response (and Disposal Plan) to be only Satisfactory. AR Tab 31 at 1028. Manson has not challenged this finding. For each of these reasons, the Corps' continuing concerns regarding Manson's clarification response were legitimate and reasonable, and Manson has provided no basis to challenge the Corps' evaluation in this regard.

#### b. The Corps' Evaluation Regarding Coordination With Columbia River Pilots Was Reasonable And Is Supported By The Record

The RFP provided that as part of the Technical Work Plan evaluation, the Corps would "evaluate how effectively and completely the plan discusses . . . coordination with the Columbia River Pilots when using rehandle or pumpout capacities." AR Tab 5 at 49. Manson complains that [redacted] 10/5 Manson Memo at 15-16. A review of the proposals and the Corps' evaluation worksheets, however, clearly reveals [redacted]

Manson characterizes both Coordination plans as [redacted] (10/5 Memo at 16). The record, however, reveals that, like [redacted]

For example, as noted by one of the TET evaluators, Manson had [redacted]t. AR Tab 22 at 979. See AR Tab 14 at 627 (Manson's proposal provided that [redacted]

PROTECTED INFORMATION TO BE DISC[redacted]ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FED[redacted]CLAIMS PROTECTIVE ORDER

GLDD, on the other hand, proposed [redacted] AR Tab 17 at 799-800. Indeed, one TET member's notes on GLDD's proposal in this area stated [redacted] AR Tab at 24 at 990.

Manson's assertions regarding the evaluation of the offerors' proposals in this area amount to nothing more than a disagreement with qualitative judgments made by the Corps' technical evaluators, which are well documented in the record. Such disagreements are not a sufficient basis to sustain a protest. <u>See</u>, <u>e.g.</u>, <u>Fru-Con Constr. Co. v. United States</u>, 57 Fed. Cl. 483, 485 (2003); <u>Bean Stuyvesant LLC v. United States</u>, 48 Fed. Cl. 303, 329 (2000).

c. **<u>The Corps Properly Evaluated Manson's QC Plan</u>**

Manson asserts that the offerors' proposals could not be meaningfully differentiated with respect to their proposed QC Plans. Manson 10/5 Memo at 16. The record conclusively demonstrates otherwise.

As Manson concedes in its 10/5 Memo, it [redacted] <u>Id.</u>; see AR Tab 14 at 634. As previously demonstrated, Manson's s[redacted]uffered from a number of problems. Moreover, as established in GLDD's 10/5 Memo at 18-20 and Appendix pages 3-4, a large portion of Manson's [redacted] -- simply repeated the specifications almost verbatim. <u>See</u> AR Tab 14 at 624-625. Most of the remainder of Manson's [redacted] focused on [redacted]ather than on QC systems and processes. <u>Id.</u> at 622-626. Therefore, it is not surprising that [redacted]

[redacted] AR Tab 21 at 975, Tab 22 at 979.

GLDD's proposal, on the other hand, included [redacted] AR Tab 17 at 823-30. As part of its QC submission (see AR Tab 17 at 713), GLDD [redacted] Based on this more detailed presentation, both TET evaluators rated GLDD's QC plan [redacted] AR Tab 23 at 984; Tab 24 at 990. Thus, the proposal and the evaluation record show real differences between the offerors' QC proposals, and Manson's complaints about this subfactor must be rejected.

### 5. The Corps Properly ~~Found That Manson's Proposal Did Not Provide~~ An Adequate Plan [redacted]

With one exception, the assertions contained in Manson's 10/5 Memo regarding evaluation of its Management Plan proposal simply repeat arguments made in its Complaint and 9/26 Memo, which are addressed comprehensively in the Gov't 10/5 Memo at 16-18 and in GLDD's 10/5 Memo at 21-29. On page 17 of its 10/5 Memo, however, Manson suggests that it was improper for the Corps to [redacted] because one of the evaluators found that [redacted] had [redacted]

[redacted] This assertion distorts the evaluation record, which completely supports the Corps' conclusions.

Manson proposed a [redacted] AR Tab 14 at 635-36. Its proposal provided [redacted] Id. at 636. Manson estimated that the project would require [redacted] dredging days, not including days for mobilization, upland disposal, dike preparation and demobilization of equipment. Id. at 639. Thus, Manson proposed that its [redacted][9]

Manson misleadingly relies on a statement on the evaluation worksheet of one TET member that [redacted] AR Tab 22 at 980. Manson fails to disclose that the same evaluator specifically noted that [redacted] AR Tab 21 at 976. Thus, the record firmly supports the Corps'

---

[9] Manson suggests at page 17 of its 10/5 Memo that it should not have been downgraded on this issue because its proposal [redacted] The portion of its proposal that Manson refers to, however, unequivocally states that there was [redacted] AR Tab 14 at 636. GLDD's proposal on the other hand, included a [redacted] AR Tab 17 at 914-15.

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

finding that Manson's site management team was [redacted], and Manson's protest regarding this issue must be denied.

**6. The Corps Properly Evaluated Performance Risk And Past Performance**

Manson's Complaint and 9/26 Memo did not challenge any aspect of the Corps' evaluation of the Performance Risk factor, including the evaluation of the offerors' past performance. Its 10/5 Memo, however, asserts that the Corps "tended to downplay aspects of the Plaintiff's proposal that were favorable" and refers to Manson's Excellent rating on Performance Risk as the only example. Manson 10/5 Memo at 20-21. Manson's assertions cannot withstand scrutiny, as the record establishes that the Corps properly credited Manson for its Performance Risk rating and past performance.

Manson did receive an Excellent rating for Performance Risk (as did GLDD), and this rating is plainly recognized in the summary of the non price evaluation factors in the SSDD. AR Tab 31 at 1026. The SSDD further notes that Manson [redacted] Id. at 1027. In addition, the SSDD establishes that Manson's Excellent rating for Performance Risk (including its past performance) was expressly considered [redacted]

Id. at 1029.

This record demonstrates that the Corps did not downplay Manson's Excellent Performance Risk rating. Instead, the Corps fully considered it, [redacted][10]

C. **Manson's Contentions Regarding The Source Selection Decision And <u>Cost/Technical Trade Off Are Without Merit And Must Be Rejected</u>**

Manson's final contention (10/5 Memo at 10, 21-31) is that the decision to award the contract to GLDD "lacked a rational basis" because it was based on an "arbitrary and capricious" cost/technical tradeoff. This claim, and the arguments made by Manson in connection with it, are factually and legally unfounded.

As GLDD and the Government have shown, in making the source selection decision, the SSA first considered and accepted the results of the technical and price evaluations, both of which were reasonable and consistent with the RFP. AR Tab 31 at 1026-28.[11] Given those results, the SSA then properly concluded that "[t]here is a meaningful and substantive difference between the technical proposals which warrants consideration of awarding on other than the

---

[10] On page 21 of its 10/5 Memo, Manson appears to argue that the Corps should have given past performance more weight than provided for in the RFP. Manson recognizes that this assertion is untimely, as confirmed by the Federal Circuit's decision in <u>Blue & Gold Fleet, L.P.</u>, 492 F.3d at 1313-15.

[11] Manson has not challenged either the Price or Performance Risk evaluations, including the SSA's conclusion that while GLDD and Manson [redacted]) AR Tab 31 at 1029. Nor has Manson challenged GLDD's [redacted]) and GLDD and the Government have shown that Manson's challenges to the evaluation of its proposal on those factors are without merit.

lowest-price offer," id. at 1028, and that GLDD's stated advantages in the "non-price factors warrant paying the price differential presented." Id. at 1029. The bases for the SSA's cost/technical trade off are set forth in detail in ¶ 10 of the SSDD (id. at 1028-29) and are summarized in GLDD's 10/5 Memo at 32-36. Those determinations are entitled to substantial deference. See GLDD 10/5 Memo at 6-7, 32-33; Gov't 10/5 Memo at 11-12.

Manson's 10/5 Memo asserts a grab-bag of challenges to the source selection decision, all of which are meritless. As GLDD has demonstrated above, Manson's initial claim (10/5 Memo at 22) -- that the source selection decision was flawed because it was made before clarifications were requested and received -- is flatly refuted by the record and is simply wrong. Manson's other allegations fare no better.

### 1. Manson's Allegations Regarding Paragraph 9 Of The SSDD Provide No Basis To Challenge The Cost/Technical Trade Off Or The Selection Decision

Pages 23-27 of Manson's 10/5 Memo focus on ¶ 9 of the SSDD and the Corps' decision to make award without discussions. The Court should note, however, that ¶ 9 does ***not*** set forth the SSA's cost/technical trade off and source selection decision. Those subjects are discussed in ¶¶ 10-11 of the SSDD, which establish that the Corps selected GLDD for award because the advantages from GLDD's superior technical proposal warranted paying the small price premium. See AR Tab 31 at 1028-29. Paragraph 9, on the other hand, is simply part of the SSDD's description of the procurement and addressed only the Corps' decision to award without discussions. Id. at 1028.

Moreover, even if Manson is now purporting to challenge the Corps' decision to make the award without discussions (and it appears from page 28-29 of Manson's 10/5 Memo that it is

not), any such challenge fails as well. As Manson concedes (Complaint ¶ 9), the RFP incorporated FAR 52.215-1. AR Tab 5 at 48. That FAR clause provides in relevant part that

> [t]he Government intends to evaluate proposals and award a contract ***without discussions*** with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's ***initial proposal*** should contain the offeror's ***best terms*** from a cost or price and technical standpoint.

FAR 52.215-1(f)(4) (emphasis supplied). The RFP also specifically cautioned offerors that "[i]t is the offeror's responsibility to insure that his/her proposal is complete prior to submittal," and that the Corps "may evaluate solely on the information provided in the proposal and will not assume that an offeror possesses any capability unless specified in the proposal." AR Tab 5 at 51.

This Court and the GAO have both recognized that an agency has no obligation to conduct discussions where, as here, the RFP notifies offerors that the Government intends to make award without discussions. See, e.g., DynCorp International LLC v. United States, 76 Fed. Cl. 528, 539 (2007); Rig Masters, Inc. v. United States, 70 Fed. Cl. 413, 420-21 (2006); HDL Research Lab, Inc., B-294959, 2005 C.P.D. ¶ 8 at 5 (Dec. 21, 2004); Century Elevator Inc., B-283822, 99-2 C.P.D. ¶ 112 at 4 (Dec. 20, 1999). As the GAO observed in Century Elevator, "[i]n such circumstances, the burden is on the offeror to submit an initial proposal containing sufficient information to demonstrate its merits, and an offeror failing to do so runs the risk of having its proposal rejected." 99-2 C.P.D. ¶ 112 at 4.[12]

---

[12] In addition, FAR 15.306 (c)(1) provides for discussions only following the establishment of a competitive range and, contrary to Manson's contention (10/5 Memo at 12), the Corps did not establish a competitive range here.

**PROTECTED INFORMATION TO BE DIS[redacted] ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FE[redacted] CLAIMS PROTECTIVE ORDER**

The courts and the GAO also have repeatedly recognized that the decision on whether to conduct discussions in such a procurement is within the agency's broad discretion. See, e.g., JWK Int'l., 279 F.3d at 988; Rig Masters, 70 Fed. Cl. at 420-21; HDL Research Lab, 2005 C.P.D. ¶ 8 at 5 (stating that "[t]he contracting officer's discretion in deciding not to hold discussions is quite broad"). In that regard, this Court and GAO have both held that an agency has discretion to make an award to a higher rated, higher priced offeror without first conducting discussions with a lower rated, lower cost offeror. See DynCorp, 76 Fed. Cl. at 539-41; Rig Masters, 70 Fed. Cl. at 420-21; Synectic Solutions, Inc., B-299086, 2007 C.P.D. ¶ 36 at 11 (Feb. 7, 2007).[13] Moreover, the GAO has recently held that an agency may properly make an award without discussions "where there is a reasonable basis to conclude that the proposal of the intended awardee represents the best overall value," Synectic Solutions, 2007 C.P.D. ¶ 36 at 11, which, as GLDD and the Government have shown, is clearly the case here.

The Corps' decision not to conduct discussion here was reasonable and well within its discretion. The SSDD establishes that the Corps' decision to make the award without discussions was based primarily on the fact that the Corps had received two acceptable proposals, both of which had fair and reasonable prices, and because "time was of the essence." AR Tab 31 at 1028. Further, and contrary to Manson's contention, there was nothing improper about the Corps's conclusion that it was not required to conduct discussions simply to give Manson a "second chance" to revise, and possibly improve, its proposal. As noted above, the

---

[13] In doing so, both the courts and GAO have effectively rejected the argument that an agency is required to conduct discussions with a lower rated/lower price offeror because discussions could have enabled that offeror to improve its proposal and possibly become the best value given its lower cost. See Rig Masters, 70 Fed. Cl. at 419-21; Synectic Solutions, 2007 C.P.D. ¶ 36 at 11.

RFP specifically told offerors that the agency intended to make award without discussions and that their initial proposals should contain their "best terms." Further, the record establishes that the Corps had more than an adequate basis to conclude that GLDD's proposal was the best value based on the offerors' initial proposals.[14]

Likewise it was reasonable for the Corps to conclude that it was not in the Government's interest to conduct discussions given the additional time that would have been required to do so. It is undisputed that "time was of the essence,"[15] and the Corps already had two acceptable, reasonably priced proposals, [redacted][16]

Finally, the Corps reasonably concluded that opening discussions presented little likelihood of obtaining materially better prices and posed some risk of price increases. The agency had two competitively priced offers, both of which it found were fair and reasonable, and which were within 4% of each other and [redacted] AR Tab 31 at 1028. Under these circumstances, the agency's judgment that [redacted]

---

[14] Contrary to Manson's contention (10/5 Memo at 24), FAR 15.306(d)(3) did not require Corps to conduct discussions in order to give Manson an opportunity to revise its proposal. That FAR provision applies only if and when the agency conducts discussions.

[15] Manson has not challenged the Corps' conclusion that "time was of the essence." The reasons for this (including the importance of the project, recent vessel groundings, and environmental limitations on when some of the work can be done) are addressed in the Gov't 10/5 Memo at 26-27.

[16] Opening negotiations (discussions) would have required preparing and submitting discussion questions to the offerors, calling for and giving offerors time to submit Final Proposal Revisions, evaluating the revised proposals, and making and documenting the source selection decision. See FAR 15.306(c); 15.307.

[redacted] Id. Moreover, as shown above, the Corps was not required to conduct discussions simply to enable the Government to possibly get a lower price. In short, the Corps specifically advised offerors that it intended to award a contract without opening discussions, and it was reasonable for it to do so here.

### 2. Manson's Challenges To The Cost/Technical Trade Off Are Meritless

Manson's challenges to the cost/technical trade off and source selection decision are also completely without merit. Manson's 10/5 Memo (pages 27-31) essentially repeats it prior allegation that the Corps' cost/technical trade off was arbitrary and capricious because Manson should have received Excellent ratings on the Technical Work Plan and Management Plan evaluation factors. These contentions have been addressed and rebutted at length in the Gov't and GLDD 10/5 Memos and above.

Manson also complains at various points in its 10/5 Memo that not all technical evaluation factors and subfactors were considered in the SSDD and that weaknesses and deficiencies (which Manson does not identify) were not included in the SSDD, thereby preventing judicial review of the source selection decision. See Manson 10/5 Memo at 10, 21. These vague and unsupported arguments provide no basis for overturning the award to GLDD.

Manson's contention that the SSDD did not consider all technical evaluation factors and subfactors is squarely refuted by the record. The SSDD establishes that:

[redacted]

[redacted]

This same record refutes Manson's unsupported contention regarding undisclosed weaknesses. As noted above, [redacted] There are no undisclosed weaknesses, the entire evaluation record is available for the Court's review, and Manson's assertions in this regard must be rejected.[17]

---

[17] Moreover, contrary to Manson's suggestions, FAR 15.308 did not require the SSA to recite each and every evaluation factor or each and every weakness in his comparative evaluation of the proposals. See Computer Sciences Corp. v. United States, 51 Fed. Cl. 297, 320-21 (2002); see also Dismas Charities, Inc. v. United States, 61 Fed. Cl. 191, 207 (2004); SAMS El Segundo, LLC, B-291620, et al., 2003 C.P.D. ¶ 44 at 18 (Feb. 3, 2003) (SSA is not required to "restate each of an offeror's strengths when comparing proposals" in the SSDD). Information Sciences Corp. v. United States, 73 Fed. Cl. 70 (2006), on which Manson attempts to rely (10/5 Memo at 21), provides no support to Manson. In that case, as in Computer Sciences, the court did ***not*** require the SSA to address each and every factor, subfactor or weakness in the comparative

Manson also criticizes the agency for observing in the cost/technical trade off section of the SSDD that [redacted] AR Tab 31 at 1029. However, that observation is completely unobjectionable [redacted] More important, it is also consistent with the basic concept of "best value" procurements, which specifically recognizes that [redacted]

Finally, Manson's complaints about the reference in the SSDD to [redacted] also miss the mark. In context, it is clear that the reference to [redacted] was intended only as a rough benchmark against which the Corps could compare [redacted], and this reference was in no way determinative of the source selection decision. Indeed, the SSA specifically stated that in this procurement, the [redacted] AR Tab 31 at 1029.

In short, Manson completely ignores the substance of the source selection decision – that the "meaningful and substantive difference between the technical proposals" warranted paying a small [redacted] price premium. That was the cost/technical trade-off on which the Corps based its

---

assessment and held instead that the court could rely on the underlying evaluation performed by the agency evaluators "without performing the same detailed analysis." Id. at 118-19. As demonstrated above, the record here indisputably establishes that SSA not only made an independent assessment of the competing proposals, but did so based on his consideration of the results of TET's evaluation, which considered all of the evaluation factors and subfactors and strengths and weaknesses in those proposals.

decision to award the contract to GLDD rather than Manson, and that conclusion, as GLDD and the Government have conclusively shown, was reasonable, supported by the record, and fully consistent with the RFP.

**D. <u>Plaintiff Is Not Entitled To Injunctive Relief</u>**

GLDD and the Government have demonstrated that the evaluation and source selection decision here were reasonable, consistent with the RFP, and fully supported by the record. Accordingly, there is no basis for granting Manson any relief, and Manson's Motion for Judgment on the Administrative Record should be denied.

At the September 27 hearing, the Court asked the parties to address the issue of injunctive relief ***assuming*** that the Court were to conclude that Manson had established a basis for relief, which Manson has not. GLDD believes that the cases cited in both Manson's and the Government's 10/5 Memos on this issue support the view that while there may be circumstances in which an injunction precluding an award to any offeror other than the plaintiff is appropriate (such as sealed bid procurements under FAR Part 14), such an injunction is ordinarily not appropriate in cases like this one, which involve a challenge to the agency's proposal evaluation and cost/technical trade off and source selection decision. Further, even Manson agrees (Manson 10/5 Memo at 37) that a remand to the agency is the appropriate remedy in cases where it is not clear that the "protester was actually the bidder or offeror who would succeed," and the Government has demonstrated (Gov't 10/5 Memo at 28-31) that this is precisely the situation here. Accordingly, while GLDD strongly believes that Manson is not entitled to ***any*** relief whatsoever, it agrees with the Government that the appropriate remedy, if any, on the particular facts of this case is a remand to the agency.

## IV. CONCLUSION

For all of the reasons stated above and in GLDD's 10/5 Memo, Manson has failed to meet its burden of proving that the Corps' decision to award the contract to GLDD was irrational, arbitrary and capricious or a clear and prejudicial violation of procurement laws and regulations. Manson is not entitled to any relief in this matter, and GLDD respectfully requests that the Court deny Manson's motions and dismiss Manson's Complaint with prejudice.

Respectfully submitted,

s/Daniel C. Sauls

Daniel C. Sauls
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

**Attorney of Record for Great Lakes Dredge & Dock Company LLC**

**OF COUNSEL**

Thomas P. Barletta
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

Dated: October 9, 2007

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**